[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 191 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 192 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 193 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 194 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 195 
The appellant, James Wyman Smith, was indicted in 1986 by the Lee County grand jury, for the capital offense of murder committed during a kidnapping in the first degree, or an attempt thereof. See § 13A-5-40(a)(1), Code of Alabama 1975. The indictment reads, in pertinent part, as follows:
 "The grand jury . . . charged that . . . James Wyman Smith . . . did intentionally cause the death of Linda Darlene Talbert by strangling her with an article or articles of clothing, and James Wyman Smith caused said death during James Wyman Smith's abduction of or attempt to abduct Linda Darlene Talbert with intent to inflict physical injury upon her or to violate her sexually in violation of Section 13A-5-40(a)(1) of the Code of Alabama."
At arraignment, the appellant pleaded not guilty and not guilty by reason of mental disease or defect. The plea of not guilty by reason of mental disease or defect was withdrawn by the appellant before the case was submitted to the jury. On June 24, 1992, the jury found him guilty of the capital offense charged in the indictment. A sentencing hearing was held before the jury, in accordance with §§ 13A-5-45 and -46, and the jury recommended by a vote of 11 to 1 that the sentence should be death.[1] Thereafter, the trial court held another sentencing hearing in accordance with §§ 13A-5-47 through -52, and, after weighing the aggravating and mitigating circumstances and considering the jury's recommendation and considering the presentence report, sentenced the appellant to death.[2] The appellant appeals his conviction and sentence, raising 14 issues. We will address those issues in the order that they appear in the appellant's brief.[3] We have searched the record for plain error as required by Ala.R.App.P. 45A.[4] *Page 196 
The state's evidence showed that on the morning of August 31, 1984, Linda Darlene Talbert, hereinafter referred to as "the victim," was abducted at gunpoint by the appellant from her place of employment, Flowers Bait and Tackle Shop, a convenience store in the Smiths Station community of Lee County. Her nude body was discovered three days later in a field several miles from the store. She had been strangled with her brassiere and pantyhose.
On December 4, 1984, the appellant, in an unrelated matter, became involved in a high speed automobile chase with the police. During the chase, he wrecked his automobile, abandoned it, and fled on foot. The appellant became a suspect in the abduction and murder of the victim when the police discovered that the tread on the tires of the appellant's automobile was similar to the peculiar tread marks left by the kidnapper's vehicle at the place where the victim's body was found. Subsequent investigation disclosed that numerous fibers and hair found on the body and clothing of the victim were similar or identical to those found in the appellant's automobile. In addition, Marion S. Enfinger, a cellmate of the appellant's in the county jail, testified that the appellant had described to him in some detail how he had abducted and killed the victim. For a more detailed recitation of the facts of this case, see Smith v. State, 581 So.2d at 500-02.
The appellant's defense consisted of calling several witnesses in an effort to discredit or to cast doubt upon the testimony of the state's witnesses and upon the state's evidence pertaining to the tread marks, fibers, and hair. He also presented several witnesses in an attempt to establish that it would have been impossible, for him on the date the crime was committed, to have been able to leave his place of employment in Columbus, Georgia, at the time reflected in his employer's time sheets, visit relatives in Columbus, travel to his house on his motorcycle, get his automobile, and drive to the convenience store in Smiths Station in time to commit the crime. The appellant did not testify at either the guilt phase or the sentencing phase of the trial.
 I.
The appellant raises several issues in paragraph I of his brief. He first contends that the trial court committed reversible error because it abused its discretion in prohibiting him from properly propounding reverse-Witherspoon[5] questions to the prospective venirepersons, i.e., questions inquiring into their "pro-death-penalty biases." In support of his contention, the appellant relies principally on Adams v. Texas, 448 U.S. 38, 100 S.Ct. 2521,65 L.Ed.2d 581 (1980), and Morgan v. Illinois, 504 U.S. 719,112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). *Page 197 
While Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968), dealt with venirepersons who were opposed to the death penalty, the instant case deals with the reverse situation; however, similar principles apply. Kuenzel v. State,577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531
(Ala. 1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242,116 L.Ed.2d 197 (1991).
The United States Supreme Court in Morgan v. Illinois held that veniremembers who would automatically vote for the death penalty for every eligible defendant must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirements of the Due Process Clause of the Fourteenth Amendment. The Court held that a capital defendant may challenge for cause any prospective juror who would automatically vote to impose death if the defendant was convicted of a capital offense; that on voir dire, the trial court is required, at the defendant's request, to inquire into the prospective jurors' views on capital punishment to identify unqualified jurors; and that jurors who are unalterably in favor of the death penalty in every case are unable to follow the law, and should therefore be disqualified. The Court warned that even if one such juror was empaneled and the death sentence imposed, the state would not be entitled to execute the sentence. Upon proper request, the veniremembers in a capital case should be questioned as to whether any veniremember has a fixed opinion in favor of capital punishment. Bracewell v. State, 506 So.2d 354
(Ala.Cr.App. 1986). "[T]he better practice is that where the death penalty is a possibility, the trial judge should examine the prospective jurors to ascertain whether any of them would clearly vote either for or against the death penalty regardless of the evidence." Kuenzel v. State, 577 So.2d at 485.
In this case, the trial court, in accordance with Ala.R.Cr.P. 18.4 and §§ 12-16-150 and -152, Code of Alabama 1975, initially administered the oath to the venire, had each venireperson identify him or herself, and addressed general voir dire qualification questions to the venire as a whole. It asked the question, "Do you have a fixed opinion against punishment which would include death or imprisonment in the penitentiary?" Seven venirepersons indicated that they did, and the court and the parties questioned them separately about their opinions. Of these, four were excused on challenges by the state for fixed opinions against the death penalty; one was challenged by the state, but that challenge was denied, and two were excused for reasons other than their opinions on the death penalty or imprisonment. The trial court then divided the venire into 5 panels of 14 members each, and permitted counsel to conduct further voir dire examination. The trial court, in the interest of time, instructed the parties to direct general background-type questions to the panels as a whole and to confine separate individual voir dire questions to the type of questions that might elicit embarrassing information, confidential information, or answers that might tend to prejudice the venire. The court stated to the parties, "I'll give you the opportunity to examine each juror individually to whatever extent you wish, within reason." The voir dire examination, consisting mostly of questions asked by the defense, extended over a period of approximately three eight-hour days, and comprise over 1400 pages of the record.
When the prosecutor directed a Witherspoon question to the venire, three more venirepersons indicated that they had reservations about recommending the death penalty. They were questioned separately by the parties. One stated that he could never vote for capital punishment under any circumstance. He was excused on challenge by the state. One was not challenged, but was later removed in a peremptory strike by the state. One was challenged by the appellant on grounds other than his opposition to capital punishment, and the challenge was granted.
We have carefully reviewed the record of the voir dire examination in this case, and we find no merit in the appellant's allegation that the trial court abused its discretion by prohibiting him from properly propounding reverse-Witherspoon questions. The record shows that such questions were *Page 198 
propounded by the appellant to nearly all of the prospective veniremembers, and as to those who were not asked such questions, the appellant obviously made a conscious decision at the time not to do so. It is true that the trial court on several occasions during the voir dire examination interceded and propounded reverse-Witherspoon questions to the venire when it concluded that the questions asked by the appellant were confusing and misleading. The trial court was merely responding to what it felt was a need to clarify and explain the questions. Many of the questions propounded by the appellant merely sought to disclose the veniremember's superficial views and opinions rather than to develop whether particular veniremembers entertained unyielding views or opinions that would prevent them from following the law as given in the court's instructions. However, a veniremember's personal feelings as to the law are immaterial unless those feelings are so unyielding as to preclude the veniremember from following the law as given in the court's instructions. "A veniremember who believes that the death penalty should automatically be imposed in every capital case should be excused." Martin v.State, 548 So.2d 488, 491 (Ala.Cr.App. 1988), aff'd,548 So.2d 496 (Ala.), cert. denied, 493 U.S. 970, 110 S.Ct. 419,107 L.Ed.2d 383 (1989). However, veniremembers who favor the death penalty should not be excused for cause where they indicate they can follow the court's instructions. Id
We find no abuse of discretion in the manner in which the trial court conducted the voir dire examination. The trial court did not prohibit the appellant from propounding reverse-Witherspoon questions, but on the contrary encouraged such questions and permitted thorough and extensive examination on the issue. The court placed no restrictions on the voir dire examination that infringed upon the appellant's ability to determine whether the veniremembers were free from bias or prejudice or to effectively exercise his strikes. We also find that the reverse-Witherspoon questions propounded by the trial court were proper and warranted under the circumstances. There was no abuse of the trial court's discretion in the handling of the voir dire examination in this regard. The voir dire examination was sufficient to eliminate any veniremember who would automatically vote for the death penalty for every eligible defendant. Contrary to the assertions of the appellant, the trial court permitted thorough and wide-ranging voir dire examination of the venire.
The following general assertions by the appellant are not supported by the record: that he was not allowed the same latitude as the state in questioning veniremembers as to their views on the death penalty; that "there was a violation of his ability to properly select a fair and impartial jury"; that the trial court rushed the proceedings, cut off questioning, did not allow proper voir dire examination, and made him "look poorly" in front of the venire; that his counsel was hindered "from following up on their obligations to defend him" by the trial court's interruptions and the prosecutor's objections; and that his counsel was not able to get full and responsive answers from the veniremembers because of the rushed proceedings. The appellant's contention that the trial court erred in not allowing him to propound certain voir dire questions to the venire from a questionnaire is without merit. The use of a questionnaire in this regard is within the discretion of the trial court. We find no abuse of that discretion here.
The scope of the voir dire examination of veniremembers is left largely to the discretion of the trial court and will not be disturbed on appeal on the ground that voir dire examination was limited absent an abuse of that discretion.Nodd v. State, 549 So.2d 139 (Ala.Cr.App. 1989). The right to question veniremembers regarding their qualifications to serve on the jury or their interest or bias is limited by propriety and pertinence and is to be exercised within the sound discretion of the trial court, and the questions must be reasonable under the circumstances of the case. McLeod v.State, 581 So.2d 1144 (Ala.Cr.App. 1990).
 "The trial judge has considerable discretion in deciding what questions may be asked of the prospective jurors on voir dire. He must be free to exclude those questions which are 'intended solely to accomplish *Page 199 
such improper purpose' or which are not 'phrased in neutral, non-argumentative form.' He must also be able to 'restrict the examination of jurors within reasonable bounds so as to expedite the trial.' And he must on occasion be allowed to restrict questioning in order to give some protection to the privacy of prospective jurors.
 "It has been correctly noted that 'appellant courts will only rarely reverse a trial judge's decision' not to permit certain questions on voir dire. Generally, courts are inclined not to reverse unless it seems likely that as a result of the limited voir dire the jury was prejudiced."
3 W. LaFave and J. Israel, Criminal Procedure § 21.3 (1984) (citations omitted).
Without giving specific reasons, the appellant contends that the trial court erred in denying his challenge for cause as to the following veniremembers: K.J., W.W., J.H., J.L., S.W., L.F., B.M., B.R., B.H., and M.D. We note that K.J., B.M., and M.D. were excused for cause on challenge of the appellant. The record shows that, although the trial court initially either denied the challenges or reserved ruling, it later granted the challenges as to those veniremembers.
The record shows that W.W. misunderstood the reverse-Witherspoon question when it was first asked by the appellant. W.W. thought he was being asked whether he had "any problems with the death penalty." On further questioning, he stated that he would not automatically recommend the death penalty in case of a conviction, that he would consider the evidence in mitigation and the alternative sentence of life imprisonment without parole, and that he would follow the law as given by instructions of the trial court. W.W., however, did not serve on the trial jury because he was removed by a peremptory strike by the appellant.
J.H. was not challenged for his views on the death penalty but because of health problems and his efforts to get excused from jury service. The trial court denied the challenge after considering J.H.'s answers and demeanor. J.H. was removed by a peremptory strike by the state.
J.L. was not challenged for his views on the death penalty but for "some problems with whether or not he [appellant] had to prove his innocence," and for some doubt as to whether he would believe any testimony of members of the appellant's family. Upon further examination, J.L. stated that regardless of his feelings, he would accord the appellant the presumption of innocence, he would place the burden of proof upon the state, and he would follow the law as given by instructions of the trial court. In reference to members of the appellant's family, he stated that he would "like to believe that [he] could decide" whether to believe the witnesses after he heard their testimony. J.L. was removed by a peremptory strike by the state.
S.W. was challenged because, on the day of the crime, her husband had made a purchase at the store where the victim worked. She was removed by a peremptory strike by the appellant.
L.F. was challenged because she worked for a company that sold items to Flowers Bait and Tackle Shop, where the victim worked. She was removed by a peremptory strike by the appellant.
B.R. was challenged on the ground that, contrary to the instructions of the trial court, she had read a newspaper story concerning the impending trial. B.R. was removed by a peremptory strike by the appellant. In reference to B.R., the record shows the following:
 "MR. JONES [defense counsel]: . . . [W]hat do you know about this case?
 "THE JUROR: Only what I read in the paper yesterday and what was mentioned Monday morning in here.
"MR. JONES: What paper did you read it in?
"THE JUROR: Columbus Ledger-Enquirer.
"MR. JONES: What did you read . . .?
 "THE JUROR: That y'all were asking a lot of questions and that — gosh, I don't even know what was in there now. It gave Mr. Smith's name and mentioned the lawyers' names, Mr. Williams and Mr. Jones. *Page 200 
 "MR. JONES: Okay, what else did it say, if you recall?
 "THE JUROR: There had been a little controversy between what questions should be asked, and what have you.
 "MR. JONES: Did it say who was directing that controversy?
"THE JUROR: I don't remember. I don't remember.
 "MR. JONES: Did it say anything else about the case in and of itself, other than what was going on in the courtroom?
 "THE JUROR: Only that — I think it gave the same information that Judge Gullage read to us in the indictment Monday morning, as well as I remember.
 "MR. JONES: Did that cause — did the information you read in that newspaper cause you in any fashion to have a predisposition about a decision you might want to make if you were on the jury?
"THE JUROR: No, sir.
 "MR. JONES: Did it cause you to have any problems with any bias whatsoever?
"THE JUROR: No, sir.
". . . .
 "MR. JONES: Okay. Do you have any difficulty with the requirement of the law that says the prosecution has — that the burden of proof is entirely on the prosecution to prove — to convince you beyond a reasonable doubt that Mr. Smith was, in fact, the person who committed this crime?
"THE JUROR: I have no problem with that.
 "MR. JONES: Similarly, do you have any problems with the proposition of law that Mr. Smith is presumed to be innocent and has no burden to establish his innocence?
"THE JUROR: I have no problem with that.
 "MR. JONES: Does the fact that Mr. Smith was arrested and charged with a crime make it difficult for you to presume him innocent?
"THE JUROR: No, sir.
". . . .
 "MR. JONES: Do you feel that because a person is accused of a crime by the state that he is probably guilty?
"THE JUROR: No, sir.
 "MR. JONES: . . . [A] capital murder trial — or if you were on this jury and you were a part of the jury that determines that Mr. Smith was guilty of capital murder and at the conclusion of that portion of the trial, then the court, the judge, would tell you that now you have to make a determination as to whether he is to be sentenced to death or if he is to be sentenced to life without the possibility of parole, knowing that your determination would be an advisory vote to the judge, do you have any bias or predisposition as to which way you would vote not knowing anything else?
 "THE JUROR: I would not know that until after it was all over with, and I assume that I would make as reasonable a judgment as I would be able to make, or anyone would be able to make based on the evidence."
A trial court's ruling on challenges for cause based on alleged bias is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion. Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, 401 So.2d 204 (Ala. 1981). To justify a challenge for cause there must be a statutory bias or some matter that imports absolute bias or favor and leaves nothing to the discretion of the trial court. Pardue v. State, 571 So.2d 320
(Ala.Cr.App. 1989), rev'd on other grounds, 571 So.2d 333
(Ala. 1990); Minshew v. State, 542 So.2d 307 (Ala.Cr.App. 1988). Even proof that the veniremember is biased or has a fixed opinion is insufficient. There must be proof that the opinion was so fixed that it would bias the verdict of the veniremember. Clark v. State, 443 So.2d 1287 (Ala.Cr.App. 1983). If the veniremember indicates that he or she can lay aside that impression or opinion and render a verdict based on the evidence presented in court, the juror is not subject to challenge for cause. Minshew v. State; Mahan v. State,508 So.2d 1180 (Ala.Cr.App. 1986).
Here, there was no proof of any bias on the part of B.R., and certainly no proof of an absolute bias that would have prevented *Page 201 
her from rendering a fair and impartial verdict. The mere fact that she read something about the case in the newspaper, even though the trial court had instructed the veniremembers not to read the newspapers does not, in and of itself, constitute a cause for challenge. Bias cannot be implied from the mere fact that a juror read the newspaper, and such reading does not constitute an automatic disqualification. B.R.'s answers to the questions posed by defense counsel show that she was not biased and further show that she was capable of rendering a fair and impartial verdict based upon the evidence presented in court. The trial court did not abuse its discretion in denying the appellant's challenge for cause of B.R. Under these facts, the denial of the challenge was proper.
B.H. was asked a reverse-Witherspoon question and responded that he would not automatically vote for a sentence of death in case of a conviction but would consider the alternative sentence of life imprisonment without parole. He was challenged because "he seemed to lean toward death." The state removed him with a peremptory strike.
After thoroughly reviewing the record pertaining to each ruling of the trial court, we find no abuse of its discretion in denying the challenges for cause, and thus find no error. We note that none of the veniremembers mentioned above served on the trial jury.
 II.
The appellant contends that Alabama's death penalty statute is unconstitutional, both as it is written and also as it was applied to him. He argues that "the requirement that a sentencer impose death unless it is shown that the mitigating circumstances outweigh the aggravating circumstances prevents any reasoned moral response to a defendant and his or her crime." We previously addressed this issue in our opinion on the first appeal of this case and found no merit to the appellant's argument. Smith v. State, 581 So.2d 497, 514
(Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531
(Ala. 1991). We now reaffirm and adopt our holding in that opinion. Section 13A-5-46(e)(3) states: "If the jury determines that one or more aggravating circumstances as defined in §13A-5-49 exist and that they outweigh the mitigating circumstances, if any, it shall return an advisory verdict recommending to the trial court that the penalty be death." (Emphasis added.) The mandatory language of the statute does not unconstitutionally prevent the jury's individualized assessment of the appropriateness of the death penalty. SeeBoyde v. California, 494 U.S. 370, 377, 110 S.Ct. 1190, 1196,108 L.Ed.2d 316 (1990); Blystone v. Pennsylvania, 494 U.S. 299,306, 110 S.Ct. 1078, 1083, 108 L.Ed.2d 255 (1990); Kuenzel v.State, 577 So.2d at 501. In Boyde, 494 U.S. at 377,110 S.Ct. at 1196, the United States Supreme Court stated:
 "Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances 'outweigh' the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.' "
The appellant's reliance on Jackson v. Dugger, 837 F.2d 1469
(11th Cir.), cert. denied, 486 U.S. 1026, 108 S.Ct. 2005,100 L.Ed.2d 236 (1988), to support his contention is misplaced. As we stated in our prior opinion, Jackson v. Dugger is clearly distinguishable from the instant case. Smith v. State, 581 So.2d at 514. See Pierce v. State, 576 So.2d 236, 254-55
(Ala.Cr.App. 1990), cert. denied, 576 So.2d 258 (Ala. 1991).
 III.
The appellant contends that the trial court committed reversible error in denying his motion to suppress evidence taken from his automobile by the police. This evidence consisted partly of hairs, fibers, and tread prints. He argues that the warrantless search of his automobile and the seizure of the items of evidence violated his rights under the Fourth and Fourteenth Amendments. We have previously addressed this same issue in our prior opinion, Smith v. State, 581 So.2d at 507-08, wherein we held that the trial court correctly denied the appellant's *Page 202 
motion to suppress and correctly overruled his objections to the admission of the challenged evidence. We held that the ruling of the trial court was proper because the appellant had abandoned his automobile and relinquished his reasonable expectation of privacy in it. We are not persuaded to change our prior holding on this issue, and we reaffirm and adopt it in this opinion. We find no merit in the appellant's contention.
 IV.
The appellant contends that Alabama's system for compensating attorneys appointed to represent indigent defendants, set out in § 15-12-21, is unconstitutional because, he says, it violates the Due Process and Equal Protection Clauses of the federal constitution and under Alabama law, it violates the doctrine of the separation of powers, it amounts to an unconstitutional taking of property without due process of law, and it deprives indigent capital defendants of the effective assistance of counsel. We have previously addressed this same issue in our opinion on the first appeal of this case. Following the decisions of the Alabama Supreme Court, we found no merit in the appellant's contention and argument.Smith v. State, 581 So.2d at 526-29. We reaffirm and adopt our holding in that opinion. Moreover, in the recent case of Exparte May, 672 So.2d 1310 (Ala. 1995), this issue was addressed again by the Alabama Supreme Court. In that case, the Court declined to revisit the question of the constitutionality of Alabama's system of compensation of indigent defense counsel.
The record reflects that the appellant has been ably represented at trial and on appeal by experienced counsel. It does not indicate in any way that counsel's efforts were deterred or diminished by the fees and expenses allowed by the statute.
 V.
The appellant contends that it was error for the trial court to admit into evidence, over his objection, photographs depicting the victim at the crime scene because those photographs were "gruesome" and "showed the advanced decomposition of the body." We have previously considered and addressed this issue in Smith v. State, 581 So.2d at 525, and we held that the trial court did not abuse its discretion in admitting the photographs into evidence. The photographs admitted in the second trial were the same photographs admitted in the first trial. We find the appellant's argument regarding this issue no more persuasive now than it was on his first appeal, and we see no reason to change our earlier holding. We reaffirm and adopt our prior holding on this issue.
The appellant also seems to argue that the photographs should not have been admitted into evidence because they tended to indicate a sexual attack. We find no merit to this argument. The indictment charged the capital offense of murder during a kidnapping (§ 13A-5-40(a)(1)), which is defined as an abduction with intent to inflict physical injury or to abuse sexually. The photographs were relevant to the charges, and the admission of the photographs into evidence was proper.
 VI.
The appellant contends that the prosecutor was guilty of misconduct and that that misconduct denied him a fair trial and sentencing in violation of his constitutional rights. He cites several instances of allegedly improper comments in the prosecutor's closing arguments to the jury.
Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v.State, 357 So.2d 397 (Ala.Cr.App. 1978), and we will not reverse the trial court on that issue unless there has been an abuse of that discretion, Miller v. State, 431 So.2d 586
(Ala.Cr.App. 1983). The prosecution, as well as defense counsel, has the right to present its impressions from the evidence, and may argue every legitimate inference that can be resonably drawn from the evidence. Sanders v. State, 423 So.2d 348
(Ala.Cr.App. 1982).
In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether *Page 203 
they might have influenced the jury in arriving at its verdict. Ex parte Ward, 497 So.2d 575 (Ala. 1986); Beecher v.State, 294 Ala. 674, 320 So.2d 727 (1975); Rutledge v. State,523 So.2d 1087 (Ala.Cr.App. 1987), rev'd and rem'd on other grounds, 523 So.2d 1118 (Ala. 1988). When a prosecutor engages in conduct that deprives the defendant of a fair trial, due process is violated. Darden v. Wainwright 477 U.S. 168,106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Improper prosecutorial argument is reviewed in the context of the entire trial. UnitedStates v. Boyce, 797 F.2d 691 (8th Cir. 1986). Prosecutorial misconduct is subject to a harmless error analysis. UnitedStates v. Martin, 815 F.2d 818 (1st Cir.), cert. denied,484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987); United States v.Boyce; Oliver v. Wainwright, 795 F.2d 1524 (11th Cir. 1986), cert. denied, 480 U.S. 921, 107 S.Ct. 1380, 94 L.Ed.2d 694
(1987).
The appellant contends that, during the prosecutor's closing argument before the jury in the sentencing phase, the prosecutor made the following allegedly improper comments:
 "With regard to the prior convictions, I think that you know that when we talk about robbery, you're talking about danger to a person. Now, I think you know when we are talking about aggravated assault, we are talking about danger to another person. And with regard to the last case, the burglary, you heard witnesses here, what that had to do with what happened over in Auburn in regard to the Auburn co-ed. Danger to a person."
Because there was no objection to the above comments, we will review this contention under the plain error rule. Evidence of the three convictions referred to in the prosecutor's argument had been introduced by the state to prove the aggravating circumstance under § 13A-5-49(2), i.e., "The defendant was previously convicted of . . . a felony involving the use or threat of violence to the person." The three offenses involved violence or the threat of violence, and evidence of the convictions was properly admitted to prove the aggravating circumstance. Thus, the comments of the prosecutor were reasonable inferences to be drawn from the evidence as well as legitimate comments on the evidence. Even if the comments had been improper, and they were not, they would be excused here under the "invited reply" doctrine. They were appropriate responses to arguments of the appellant's counsel that there was no evidence that anyone had been injured in the commission of the crimes forming the basis of the prior convictions. We find no error, and certainly no plain error.
The appellant contends that the following comments made by the prosecutor during his closing argument in the guilt phase of the trial were improper:
 "[Prosecutor]: Back on August 31, 1984, [the victim] was alive and well. No one had one unkind word to say about her —
 "[Defense counsel]: We are going to object to this argument.
"[Prosecutor]: You heard —
"The Court: Overruled.
 "[Prosecutor]: — the testimony. She was a wife and mother, and she was working to help support her family at Flowers [Bait and Tackle Shop]."
He argues that these comments violate Booth v. Maryland,482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).
There is no merit in this contention. Booth v. Maryland has been overruled by Payne v. Tennessee, 501 U.S. 808,111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). There was evidence introduced that the victim was alive on August 31, 1984, was a wife and mother, and was working at Flowers Bait and Tackle Shop to support her family. The prosecutor's remarks do not constitute victim impact argument as the appellant contends, but were a legitimate comment on the evidence.
The appellant contends that the following comments by the prosecutor made in the guilt phase were improper:
 "We talked about the sexual attack. You remember, I talked with you about circumstantial evidence. There wasn't any evidence of sexual attack here that could be gathered or gained from investigators of the Department of Forensic Sciences. But, you have the right to look at those photos and compare that with all the other *Page 204 
things you know about this case and conclude that there was a sexual attack or, at least, an attempted sexual attack."
First, we note that no objection was made to this argument; thus, we review the issue under the plain error rule. The appellant contends that these comments are improper because they refer to an unrelated case. We do not agree. These comments refer to the instant case, they are a fair comment on the evidence, and they relate to averments in the indictment. We find no error, much less plain error.
The appellant contends that the following comments by the prosecutor during the sentencing phase before the jury were improper:
 "[The appellant has] spent his life inflicting pain and suffering on many people. And, he has engaged in a continual course of conduct."
Again, no objection was made. We find no error here, much less plain error. The comments were proper and based upon the evidence.
The appellant contends that the following comments made by the prosecutor during the sentencing phase before the jury were improper:
 "Ladies and gentlemen, it boils down to this at this time, and it's up to you and it's your decision to decide what the facts are and listen [to] the law as given to you by Judge Gullage. And it's going to be your very serious and awesome decision, and ladies and gentlemen, now is the time. The victim's family has got a right to know."
 "Your recommendation that you make to Judge Gullage is very, very important, and it will send a message. Ladies and gentlemen, send a message."
These comments are a proper appeal for law enforcement.Ex parte Waldrop, 459 So.2d 959 (Ala. 1984), cert. denied,471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). These comments by the prosecuting attorney were proper comments in the sentencing phase.
After reviewing the record, we find no merit in the appellant's contention that the prosecutor improperly solicited testimony from witnesses concerning "victim characteristics" and "the impact of the . . . offense on the victim's family." Further, we find no merit in the appellant's contentions that the arguments of the prosecutor wrongfully incited or tended to incite the jury to consider the future dangerousness of the appellant to others; that he was prejudiced by the prosecutor's description of the nature of his other convictions, or that the prosecutor urged the jury to consider that the appellant would commit future illegal acts. We have reviewed the entire arguments of the prosecutor in this case and find no error, either at the guilt or sentencing phases of the trial.
 VII.
The appellant contends that the trial court erred in denying his motion for a continuance based on the expected unavailability of his expert witness, Dr. David Hall of Auburn University, that it erred in admitting into evidence testimony concerning fibers that were seized as a result of an allegedly illegal search of the appellant's automobile, and that it erred in admitting into evidence the fibers seized because, he says, the evidence was "not of a sufficient probative nature to allow [its] admission into evidence."
Approximately three weeks before trial, on May 28, 1992, the appellant moved for a continuance on several grounds. One of the grounds was that he expected his expert witness, Dr. Hall, to be teaching in China during the time the trial was scheduled and thus would be unavailable. Dr. Hall was an expert in the analysis of hair and fiber evidence, and he had testified for the appellant in the first trial of this case. The motion for continuance was denied on May 29, 1992. On the first day of the trial, the appellant renewed his motion for a continuance, arguing that he had not had time to review the information furnished him by the state pursuant to his discovery motion. He did not mention as a reason for the continuance the unavailability of Dr. Hall. *Page 205 
It is well settled that a motion for a continuance is addressed to the sound discretion of the trial court and that, absent a showing of abuse of that discretion, the trial court's decision on the matter will not be overturned on appeal. Arnold v. State, 601 So.2d 145 (Ala.Cr.App. 1992); see generally cases cited at 14 Ala. Digest 2d § 586.
To warrant a continuance on the ground that a witness is absent, it must be shown that the expected testimony of the witness is material and competent, that there is a probability that the evidence will be forthcoming if the case is continued, and that the moving party exercised due diligence to secure the evidence. Ex parte Saranthus,501 So.2d 1256 (Ala. 1986). Material evidence means "[e]vidence which has an effective influence or bearing on questions in issue."Black's Law Dictionary 976 (6th ed. 1990). "Simply put, a 'material' fact is one that would matter in the trial on the merits." Sumner v. Sumner, 664 So.2d 718, 723 (La.App. 1995). It must be shown that substantially favorable testimony would be given by the witness and that the denial of a continuance would materially prejudice the defendant. Whitehead v.State, 429 So.2d 641 (Ala.Cr.App. 1982). In addition, it must be established that the expected testimony is not merely cumulative or in the nature of impeachment, and the motion for a continuance must not be made merely for purposes of delay.Mitchell v. Moore, 406 So.2d 347 (Ala. 1981); Malone v. State,659 So.2d 1006 (Ala.Cr.App. 1995); McClellan v. State,628 So.2d 1026 (Ala.Cr.App. 1993); Prince v. State, 623 So.2d 355
(Ala.Cr.App. 1992).
The appellant made no showing as to what the witness's testimony would be if he were present and testified. The refusal to grant a continuance because a witness will be absent is not error if there is no showing of what the witness would testify to. Smith v. State, 368 So.2d 298
(Ala.Cr.App. 1978), writ quashed, 368 So.2d 305 (Ala. 1979);Castona v. State, 17 Ala. App. 421, 84 So. 871 (1920). Thus, the appellant failed to establish that the expected testimony would be material and competent, that it would be substantially favorable to him, that it would not be merely cumulative or in the nature of impeachment, or that the denial of the continuance would be prejudicial to him. His motion for continuance merely averred, "The defense believes that Dr. Hall's testimony is an important aspect of this case. . . ." Not only did the appellant fail to make the necessary showing, he made no effort to stipulate into evidence the testimony of his expert or to introduce his experts' testimony given at the prior trial of the case, which would have been admissible, seeEx parte Wright 625 So.2d 1135 (Ala. 1993); Charles W. Gamble,McElroy's Alabama Evidence §§ 245.07(1), et seq. (4th ed. 1991), or to locate another expert.
We note that Dr. Hall's testimony at the first trial did not contradict that of the state's expert, but rather supported it. In his testimony, he explained the fiber production process. He stated that he found "no significant dissimilarities" between the found and known hairs and fibers. He further stated that "the fact that we had all these fibers together at one time is probably significant." This obviously accounts for the appellant's failure to offer Dr. Hall's prior testimony in evidence or to seek another expert. Under the circumstances here, we hold that the trial court did not abuse its discretion in denying the motion for continuance.
The appellant further contends that the trial court erred in permitting the state's expert witness, John Kilbourn, a forensic scientist, to testify concerning fibers and hair found on the victim and in the appellant's automobile. He questions Kilbourn's qualifications to testify as to the analysis and comparisons of fibers and hair. He did not object to Kilbourn's testimony on this ground during the trial; therefore, we review this contention under the plain error rule. Whether a witness is sufficiently qualified to testify as an expert is a question for the trial court to resolve in its discretion, and its ruling will not be disturbed on appeal unless it has abused that discretion.Bailey v. State, 574 So.2d 1001 (Ala.Cr.App. 1990); Johnson v.State, 378 So.2d 1164 (Ala.Cr.App.), writ quashed,378 So.2d 1173 (Ala. 1979). Kilbourn testified extensively about his qualifications, which included his education, background, and experience. His testimony was clearly sufficient to establish that *Page 206 
he was an expert in the field of hair and fiber analysis. He testified as an expert on the same matters in the previous trial, and no objection was raised at that time to his qualifications. There was no abuse of the trial court's discretion in permitting Kilbourn to testify as an expert.
The appellant contends that the fibers and hair were not of a "sufficient probative nature to allow their admission into evidence." We do not agree. The test of relevancy is whether the offered testimony bears any logical relationship to the ultimate inference for which it was offered. Garner v. State,606 So.2d 177 (Ala.Cr.App. 1992); C. Gamble, supra, § 21.01. The inference for which the evidence is offered must be material to an issue in the case. Garner v. State. Here, the fiber and hair evidence was material and relevant, and it was proper for the jury to consider it in determining whether the victim had been in the appellant's automobile. Questions of materiality and relevance of the evidence lie within the sound discretion of the trial court. McMahon v. State, 560 So.2d 1094
(Ala.Cr.App. 1989); Borden v. State, 522 So.2d 333
(Ala.Cr.App. 1988); C. Gamble, supra, § 21.01(6). The testimony of Kilbourn concerning his comparisons between the fibers and hair found on the victim's body and clothing and the fibers and hair found in the appellant's automobile strongly supports an inference that she was in the appellant's automobile. The number of different pieces of known fiber and hair that matched or were found to be similar to questioned fibers and hairs is highly significant. We find no abuse of discretion by the trial court in allowing this testimony into evidence.
 VIII.
The appellant contends that the trial court erred in not enforcing an "open file" policy as to discovery. For this alleged error, he asks us to reverse the trial court's judgment and render a judgment for him. On November 6, 1991, over seven months before trial, the appellant sought extensive discovery by motions filed pursuant to Rule 16, Ala.R.Cr.P. (formerly Rule 18, Ala. R.Crim.P.Temp.);Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963); Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763,31 L.Ed.2d 104 (1972), and Ex parte Monk, 557 So.2d 832
(Ala. 1989). He moved for the production of all materials and information of whatever nature in the files or in the possession of the district attorneys of the twenty-sixth and thirty-seventh judicial circuits,[6] all materials in the possession of the Lee County circuit and district courts, all materials in the possession of the sheriff's departments of Lee and Russell Counties and the police departments of Auburn and Opelika, and all materials in the possession of the Alabama Bureau of Investigation and the State Department of Forensic Sciences pertaining to this case. He also moved for production of all records and files in the county and municipal jails of Lee County, Alabama Department of Human Resources, Alabama Department of Mental Health and Mental Retardation, Taylor Hardin Secure Medical Facility, Bryce Hospital, State Board of Pardons and Paroles, or "any other hospital or mental health facility of any kind" pertaining to the state's witness, Marion S. Enfinger. He moved for an order directing the prosecution to reveal the identity of any informants, and reveal any deals, promises, or inducements made to obtain the testimony of any witness, particularly Marion S. Enfinger. He moved for an order directing the prosecution to produce any exculpatory evidence. He also moved for production of the grand jury records pertaining to him.
Rule 16, Ala.R.Cr.P., provides for discovery in criminal cases. The rule is similar to Rule 16, Fed.R.Crim.P. Failure to comply with this rule is viewed with disfavor and is condemned. Morrison v. State, 601 So.2d 165 (Ala.Cr.App. 1992). However, we also recognize that a failure to comply with the rule does not always mandate reversal. Buchannon v. State,554 So.2d 494 (Ala. 1989). The rule clearly places the remedy for violations within the sound discretion of *Page 207 
the trial court, and to support a claim for reversal of the exercise of that discretion, the accused must show prejudice to substantial rights. Morrison; McLemore v. State,562 So.2d 639 (Ala.Cr.App. 1989); Buchannon; Rule 16.5.
The United States Supreme Court, in Brady v. Maryland, established that a prosecutor has a constitutional duty to disclose evidence favorable to the defendant. This duty extends to evidence favorable on the issue of sentencing as well as on the issue of guilt. In Brady, the Court held that the government's failure to disclose evidence favorable to a defendant who specifically requested it violates the defendant's due process rights when the evidence is material to guilt or punishment. 373 U.S. at 87, 83 S.Ct. at 1196-97. To establish a Brady violation, the defendant must demonstrate: (1) that the prosecutor suppressed evidence, (2) that the evidence was favorable to him or was exculpatory, and (3) that the evidence was material. Ex parte Kennedy, 472 So.2d 1106
(Ala. 1985), cert. denied, 474 U.S. 975, 106 S.Ct. 340,88 L.Ed.2d 325 (1985); Kimbrough v. State, 565 So.2d 1249
(Ala.Cr.App. 1990).
In addition to exculpatory evidence, a defendant is also entitled to disclosure of information that might be used to impeach government witnesses. In Giglio v. United States, the Supreme Court, applying Brady, held that it was a violation of due process for the government not to disclose that it had promised a key witness that he would not be prosecuted for his part in a crime if he testified against his accomplice. See also Ex parte Bankhead, 585 So.2d 112 (Ala. 1991).
In Ex parte Monk, 557 So.2d 832 (Ala. 1989), the Alabama Supreme Court held that capital cases are sufficiently different from other criminal cases to justify the exercise of judicial authority to order the state to maintain an ongoing "open file" policy in regard to discovery by the defendant, subject to certain safeguards for the prosecutor. For information not discoverable and the conditions of discovery, see Rule 16.1, et seq.
The trial court, pursuant to Rule 16 and following the mandate of Ex parte Monk, ordered the prosecution to open its file to the appellant and to permit full disclosure. The trial court stated, "I order that whatever the law provides as to discovery from the prosecution's file, he will furnish to you." It further stated that the order of discovery did not include personal notes or work product of the prosecutor and his staff unless those items contained exculpatory information. In compliance with Brady, the trial court further ordered that "any agency of the State of Alabama that has information that is or might be exculpatory, to give that to you." In response to the motion to disclose any deals between the state and any witness, the trial court ordered, pursuant to Giglio, "If there are any, tell them." In reference to the files of various state and local agencies and institutions, the trial court granted the motion "insofar as I can order them to furnish them to you," and directed that the parties could look at the files.
The record shows that much time was devoted to discovery in this case and that it was extensive. It also shows that the trial court was actively involved in the discovery process; that it made an extraordinary effort to see that the appellant obtained all information and materials that he sought; and that it granted all of the appellant's discovery motions. There was extensive discovery in the first trial of this case, and the same attorneys represented the appellant in both trials.
The appellant's complaint is not that his discovery motions were not granted, but that the trial court failed to make the prosecutor fully comply with the discovery orders and follow an "open file" policy. The appellant also complains of the difficulty he had in obtaining records of other agencies and jurisdictions not under the control of the prosecuting attorney. He takes the position that the prosecutor had the duty to search the records of other agencies and jurisdictions and to produce those records if they contained any information concerning the appellant or Enfinger.
The question of the scope of the prosecution's obligation to obtain and to make available for discovery items that are not within its immediate possession arises in almost every *Page 208 
case where the defendant seeks discovery.
 "In Parker v. State, 587 So.2d 1072, 1086
(Ala.Cr.App. 1991), we stated:
 " 'The appellant's discovery rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were not violated because the prosecutor is not required to disclose evidence he does not possess. "While it is true that under Brady the good faith of the prosecutor in not disclosing information is irrelevant, 373 U.S. at 87, 83 S.Ct. at 1196, Brady does require that the information requested be known to the prosecution. United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); Antone v. Strickland, 706 F.2d 1534, 1544 (11th Cir. 1983) (Kravitch, J., concurring specially), [cert. denied, 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983)]. . . . United States v. Walker, 720 F.2d 1527, 1535 (11th Cir. 1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984).'
 "In certain situations, however, knowledge of the existence of evidence will be imputed to the prosecution even when the prosecution is without actual knowledge of the existence of the evidence. 'Knowledge of requested information is presumed when the information is in the prosecutor's files. . . .' Ex parte Cammon, 578 So.2d 1089, 1091 (Ala. 1991), citing United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The knowledge of law enforcement agents is also imputed to the prosecution. Duncan v. State, 575 So.2d 1198 (Ala.Cr.App. 1990), cert. denied, 575 So.2d 1208 (Ala. 1991). See also Felix V. Lapine, Annotation, Withholding or Suppression of Evidence by Prosecution in Criminal Case as Vitiating Convictions, 34 A.L.R.3d 16, § 12[a] (1970); 21A Am.Jur.2d, Criminal Law, § 770 (1981); W. LaFave and J. Israel, 2 Criminal Procedure § 19.5 (1984)."
 " 'The duty of disclosure extends not only to the individual prosecutor and the prosecutor's office . . . but also to persons working as part of the prosecution team or intimately connected with the government's case, even if not employed in the prosecutors office, such as police, investigative agencies and officers, and all law enforcement agencies which have participated in the investigation or evaluation of the case and regularly report or have reported to the prosecutor.'
"22A C.J.S. Criminal Law, § 489(b) (1989)."
Hill v. State, 651 So.2d 1128, 1131-32 (Ala.Cr.App. 1994).
We find it unnecessary in this case to decide whether the prosecutor had the responsibility to search the files of the named agencies, which were not under his control, because the record shows that the appellant obtained the files and information from these agencies by using the processes of the court. While he may have experienced difficulty in obtaining some of the materials sought, the record shows that he did, in fact, obtain them, before trial. The appellant has not established that the prosecutor suppressed any evidence, violated the discovery orders of the court, or violated the "open file" policy of Monk. Moreover, the appellant failed to establish that the prosecutor suppressed any exculpatory evidence or any evidence favorable to him. Thus, there was noBrady violation. His contention that "there was not complete and adequate discovery" is not supported by the record. He does not cite us to any information, evidence, or document that he did not receive.
The trial court is in the best position to determine whether its discovery orders have been complied with, and we will not reverse its decision on discovery matters unless an abuse of discretion has been shown. Clearly, no abuse of discretion has been shown here. The appellant's right to a fair and impartial trial was not prejudiced by the nondisclosure of evidence or by the discovery process itself. There was no error in the trial court's rulings or in its handling of discovery in this case.
In reaching these conclusions, we have reviewed the specific instances alleged by the appellant as evidencing misconduct or unfair practices. For example, the appellant argues that be was prejudiced because be did not receive some of the information sought *Page 209 
by discovery until the week before trial. In this regard, he specifically refers to information obtained from files of the Lee County Sheriff's Department 10 days before trial concerning someone who apparently was considered a suspect during the early phases of the investigation. The fact that there had initially been another suspect was elicited by the appellant during the trial through the cross-examination of the victim's husband, Donny Talbert, and Investigator Jay Jones. Talbert testified that there had been some "ill feeling" in the past between his wife and this other person; that they had worked together in the same department of a textile plant; that his wife had apparently been offended by a remark this person had made to her; and that the incident was reported to her supervisor and nothing further transpired. Talbert also testified that he gave this information to the investigators early in the investigation when he was asked if he knew of anyone who might possibly be considered a suspect; that, during the time between the murder and the indictment of the appellant, he had heard many rumors about possible suspects; and that he had heard that he had been a suspect at one time. Investigator Jones testified that this other person was considered a suspect early in the investigation; that he gave a statement that he was in Flowers Bait and Tackle Shop and made a purchase on the day and at about the time the crime was committed; and that he was waited on by a white male. About a week later, according to Jones, this person made another statement saying that he was mistaken and that he was not in the store on the day the crime was committed, but on the day before. These conflicting statements and the fact that he had had a prior difficulty with the victim made him a suspect early in the investigation.
The appellant had the full benefit of this information concerning the other suspect, he presented it to the jury through cross-examination, and endeavored in closing argument to the jury to cast suspicion on this person. Even if the prosecutor had failed to disclose this information before trial, and no showing has been made that that was the case, any error would be harmless because the appellant was allowed to present the information to the jury and to comment extensively on it in argument. The appellant was fully able to make whatever use of this information he desired. SeeHenderson v. State, 583 So.2d 276 (Ala.Cr.App. 1990), aff'd,583 So.2d 305 (Ala. 1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268,117 L.Ed.2d 496 (1992).
Thus, only a Giglio question remains.
In reference to the trial court's order to the prosecutor to reveal any deals that he had made to obtain the testimony of witnesses, the appellant apparently contends that the prosecutor intentionally failed to disclose or suppressed evidence of the fact that he had made such a deal with Enfinger. Enfinger was arrested on November 28, 1984, and was incarcerated in the Lee County jail. From early December 1984 until February 1985, he and the appellant were cellmates. The appellant was incarcerated for the offense of burglary arising out of an incident at Auburn University — an offense unrelated to the instant crime. On February 8, 1985, Enfinger pleaded guilty to one count of obtaining drugs by fraud (two other counts were nol-prossed), was sentenced to 15 years' imprisonment, and was transferred to the state penitentiary. On March 20, 1985, and again on March 27, 1986, he filed a pro se motion seeking a reduction of his sentence. Both motions were denied. In these motions, Enfinger asked that his sentence be reduced or split so that he could earn good time. They made no mention of any agreement. In the second motion, Enfinger mentioned his poor health. In February or March 1986, he contacted the warden of the penitentiary and told him that he had information about the kidnapping and murder of the victim. He subsequently gave a statement and testified before the Lee County grand jury. In this statement and also in his testimony, he stated that while he was incarcerated in the same cell with the appellant, the appellant told him that he had abducted and killed the victim, and described in detail how he had done it.
On May 23, 1986, Enfinger filed another motion seeking modification of his sentence, and Floyd Les Likins, Jr., who had represented him in his guilty plea proceeding, was *Page 210 
appointed to represent him on June 23, 1986. This motion was essentially the same as the two previously filed; it too made no mention of any agreement with the prosecution or promise; and it mentioned Enfinger's poor health. In the fall of 1986, the appellant was indicted for the capital offense charged in the instant case. In November 1987, Enfinger testified against the appellant at the first trial of this case. In February 1988, Enfinger wrote to the court that it was his understanding, as conveyed to him by his attorney, that his motion for modification of his sentence would be heard after the sentencing phase of the appellant's trial. Also in this letter, Enfinger urged that he be released so he could leave the state because he feared retribution for testifying. On May 4, 1988, a proceeding was held before the Circuit Court of Lee County, and Enfinger's 15-year sentence was suspended, and he was placed on 5 years' probation by order of the court. Enfinger was represented at these proceedings by Likins, and the state was represented by the district attorney of Lee County. On November 8, 1988, Enfinger's probation officer received a letter from Enfinger, who was then confined to a nursing home, in which he mentioned that he is "not ashamed of testifying against Smith and receiving probation as a part of the bargain." He died in August 1989. A memorandum dated November 28, 1990, in the file of the Lee County Probation and Parole Office states, "Because he had been a major witness in a capital murder trial, and because he had terminal cancer, he was granted unsupervised probation and permitted to leave the state."
At the second trial of this case, Enfinger's testimony at the first trial was read to the jury and made a part of the record. In the first trial, Enfinger was vigorously cross-examined as to any promise or deals that might have been made in exchange for his testimony. He testified that no promises had been made to him in order to get him to testify. The record shows as follows:
 "Q. [Prosecutor]: . . . Now, have you discussed any benefits that might accrue to you with any other law enforcement officials?
"A. [Enfinger]: No, sir.
 "Q. And your testimony is that nobody has said that your sentence might get split or commuted or [you might] get put on probation as a result of this testimony?
 "A. That's correct. I would be foolish not to hope that my motion that I filed several months before I agreed to testify, I would be foolish not to hope for a favorable ruling on that. But I hope that it would be done on its merit. But I have been made no promises as to testifying in this case, no, sir."
Likins, Enfinger's attorney at his guilty plea proceeding, sentencing, and probation proceeding, testified in the instant case that no promises were made in exchange for Enfinger's testimony, that Enfinger had no interest in the reward that had been posted for the conviction of someone for the victim's murder, and that all Enfinger ever sought was protection from the appellant while he was in prison. The prosecuting attorney represented to the court that no promises had been made to Enfinger in order to get his testimony.
A hearing on discovery motions was held on November 8, 1991, more than seven months before trial. At this hearing, the trial court ordered the prosecutor to disclose any deals or agreements he had made with witnesses. The prosecutor represented that there were none. The record of this hearing shows that the appellant knew, and had probably known for over a year, that Enfinger had received probation and had been released from prison. The appellant argues that the release of Enfinger on probation is "prima facie evidence of a deal" and that the prosecutor's suppression of evidence of that deal violated Giglio. We do not agree. The record does not support and the appellant has failed to establish that there was a deal that Enfinger would be released from prison in exchange for his testimony. Enfinger may have hoped that he would receive some future benefit for having testified; however, the record does not support a conclusion that there was a deal between the state and Enfinger. The appellant had all the relevant information and court records and documents pertaining to Enfinger and the manner in which Enfinger's case was handled. He *Page 211 
brought it all before the jury and vigorously argued the possibility of a deal and Enfinger's credibility in closing argument to the jury. The appellant was allowed to present this information to the jury and to make whatever use of it he desired. The jury obviously understood how Enfinger could have possibly benefited from testifying for the state, and this knowledge evidently did not affect its judgment of his credibility. See Weaver v. State. We find no Giglio violation here.
The appellant complains that by the time he discovered that Enfinger had taken a polygraph examination, he did not have time to obtain his own expert to evaluate the results. He learned of the test 10 days before trial when evidence of the test was discovered in the files of the Lee County Sheriff's Department. The opinion of the polygraph operator was that Enfinger was telling the truth. The trial court ordered all the test results delivered to the appellant, offered to authorize funds to the appellant for a polygraph expert if one could be found, and offered to allow that the results of Enfinger's test be transmitted by facsimile machine to any out-of-town expert. The appellant did not avail himself of this opportunity. The results of the test were not offered into evidence. We find no merit in this complaint. We note that the results of polygraph tests offered by a defendant are inadmissible during the guilt phase of a trial because the reliability of polygraph examinations have not been sufficiently established. Ex parte Hinton, 548 So.2d 562
(Ala. 1989).
 IX.
The appellant contends that it was error for the trial court to admit, over his objection, the prior testimony of Marion S. Enfinger.
 "In Anderson v. State, Ala.Cr.App., 362 So.2d 1296, this court stated the general rule regarding the use of former testimony, as follows:
 " ' "Testimony of a witness, in a former trial or action, given (1) under oath, (2) before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross-examination, (3) under circumstances affording the party against whom the witness was offered an opportunity to test his credibility by cross-examination and (4) given in a litigation in which the issues and parties were substantially the same as in the present cause, is receivable as evidence in the present trial (5) when the personal attendance of the witness to testify in the present trial is not feasible." '
 "Williams v. State, 375 So.2d 1257, 1269
(Ala.Crim.App.), cert. denied, 375 So.2d 1271
(Ala. 1979). See also, C. Gamble, McElroy's Alabama Evidence § 245.07(1) (3rd ed. 1977)."
Nolen v. State, 469 So.2d 1326, 1328 (Ala.Cr.App. 1985).
 "In order for former testimony to be admissible in present litigation, proof must be made to the reasonable satisfaction of the trial judge that the personal attendance of the witness at court is not procurable or, if procurable, is ineffective, in consequence of legally recognized causes, to procure his testimony. The following cases of nonproduction of the witness have been held sufficient: that the witness is dead. . . ."
C. Gamble, supra, § 245.07(8) (footnotes omitted). "The sufficiency of the proof of the predicate of unavailability of an absent witness is addressed to the sound discretion of the trial judge." Nolen v. State, 469 So.2d at 1328.
The state presented a certified copy of a death certificate from Los Angeles County Department of Vital Statistics in California, showing that Enfinger was dead. The trial court did not abuse its discretion in determining that the proof of the predicate of unavailability was sufficient.
The appellant also contends that his right to confrontation was denied by the admission into evidence of Enfinger's prior testimony because, he says, he was not able to impeach Enfinger on facts learned subsequent to Enfinger's testimony in the first trial, particularly the evidence of the possibility of a deal with the prosecution for his testimony and of the possibility that his testimony *Page 212 
had been influenced by the hope of a reward. When a state's witness is unavailable and the prior recorded testimony of the witness is admitted, the requirements of the Confrontation Clause are met if that prior testimony is marked with such truthworthiness that there is no material departure from the reason of the general rule, and if it bears indicia of reliability that would afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement. Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531,65 L.Ed.2d 597 (1980); Mancusi v. Stubbs, 408 U.S. 204,92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); Rouse v. State,548 So.2d 643 (Ala.Cr.App. 1989); Miles v. State, 366 So.2d 346
(Ala.Cr.App. 1978). As we have previously noted, the jury was given the benefit of the evidence that the appellant now argues the absence of which makes Enfinger's testimony unreliable. Because the jury considered this evidence, vigorously argued by defense counsel to be impeaching, the indicia of reliability of Enfinger's testimony remains intact; the jury was afforded a satisfactory basis for evaluating the truth of Enfinger's prior testimony; and the appellant's right to confrontation was not violated.
 X.
The appellant contends that, during the sentencing phase, the fact that the state relied upon the kidnapping, which was an element of capital murder, to support an aggravating circumstance, violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. This practice of counting an element of capital murder as an aggravating circumstance has been upheld. Burton v. State, 651 So.2d 641 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala. 1994); cert. denied, 514 U.S. 1115, 115 S.Ct. 1973,131 L.Ed.2d 862 (1995).
 "Clearly, § 13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in § 13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not . . . punish a defendant twice. Kuenzel, supra."
Id., at 657-58. Thus, the appellant's contention is without merit.
Having held that the jury's consideration of the kidnapping as an aggravating circumstance was proper, we also hold that contrary to the appellant's assertion, the fact that it was permitted to consider kidnapping as an aggravating circumstance did not result in the arbitrary imposition of the death penalty.
The appellant's arguments regarding the use, over his objection, of his three prior convictions for the purpose of proving aggravating circumstances are also without merit. He claims that his 1964 Georgia conviction for robbery by the use of a weapon should not have been used as an aggravating circumstance because of its remoteness. He cites no authority in his brief to this court for this proposition. However, the aggravating circumstance set out in § 13A-5-49(2) — that "the defendant was previously convicted of . . . a felony involving the use or threat of violence to the person" — clearly has no time limitation upon it. The use of that conviction as an aggravating circumstance was proper.
We also hold that the use of the appellant's 1973 Georgia conviction for aggravated assault, arising out of an "unlawful assault and attempt to run into and against [the victim] with an automobile" was proper.
As to the appellant's 1985 conviction for burglary in the first degree, he argues that the court erred in admitting evidence of the conviction because the conviction occurred after the date of the occurrence of the present offense. Section 13A-,5-39(6), Code of Alabama 1975, states the following in regard to the terms "Previously Convicted" and "Prior Criminal Activity": "As used in sections 13A-5-49(2) [aggravating circumstances] and 13A-5-51(1) [mitigating circumstances], these terms refer to events occurring before the date of the sentence hearing." See Ex parte McWilliams,640 So.2d 1015, 1023 (Ala. 1993). Therefore, the appellant's argument is without merit.
The appellant also contends, in regard to this burglary conviction, that it was error for the state to use "the testimony of the Circuit Clerk to add the element of 'use or threat of violence to the person' to make the case a viable aggravating circumstance." The circuit clerk testified that she was present *Page 213 
at the proceeding wherein the appellant testified that he entered the window of a female Auburn student's apartment, that he grabbed her around the neck, and that a gunshot was fired from a gun he had in his hand. This testimony was properly admitted pursuant to § 13A-5-45(c) and (d), which state as follows:
 "(c) At the sentencing hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in sections 13A-5,49, 13A-5-51 and 13A-5-52. . . .
 "(d) Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements."
The circuit clerk's testimony was relevant to, and of probative value in, the sentencing phase of the trial.Siebert v. State, 562 So.2d 586, 598 (Ala.Cr.App. 1989), aff'd,562 So.2d 600 (Ala.), cert. denied, 498 U.S. 963,111 S.Ct. 398, 112 L.Ed.2d 408 (1990); Hallford v. State, 548 So.2d 526
(Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied,493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
 XI.
The appellant contends that he was denied due process and the effective assistance of counsel because the trial court denied his request to be transferred from Holman Prison, where he was serving a sentence of life without the possibility of parole, to Lee County jail. He claims that because he was not moved to Lee County, his access to his attorneys was limited. He also claims that he was denied access to the law library, that telephone calls were limited, and that his mail was limited and censored.
We again note that the appellant was represented at both his first trial and at this trial by the same counsel. The trial court, when denying the motion, remarked upon the excellent job his attorneys had done on the appellant's case. We agree. Furthermore, we note that the trial court, in a memorandum regarding the appellant's access to the law library, and his use of the telephone and the mail, stated that although there were some reasonable limitations, books and materials that the appellant had requested were delivered to him; that he was made available for telephone calls from his attorneys within 20 minutes when prison officials were notified by the attorneys that they needed to speak to him; and that he was provided with two stamps each week and could buy as many as he wanted. The trial court also noted that the warden had informed him that his mail to and from his attorneys was not read or censored, but was merely opened to check for contraband.
 XII.
The appellant contends that it was error for the trial court to deny his motion to disqualify the jury panel drawn for the week of his trial. He argues that the method of drawing the panel from a list of citizens having a driver's license is unconstitutional because it "excludes many persons who may he registered voters and good, decent, law-abiding folks, who do not have a driver's license."
"The fair cross-section test set out in Duren v. Missouri,439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), is whether a 'distinctive group' in the community has been underrepresented in venires as a result of systematic exclusion of that group in the jury selection process." Joyce v. State, 605 So.2d 1243,1245 (Ala.Cr.App. 1992). The appellant in this case, like the appellant in Joyce v. State, presented no evidence that alleged underrepresentation resulting from the practice of drawing names of potential jurors from driver's license rolls or that the practice resulted in systematic exclusion of a particular group. "A failure to include the name of every qualified person on the jury roll is not a ground to quash an indictment or a venire, absent fraud or purposeful discrimination. Swain v.Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)."Joyce v. State, 605 So.2d at 1245.
"The appellant has presented no evidence of fraud or purposeful discrimination. He *Page 214 
has failed to make out a prima facie case of improper jury selection based on the allegedly improper composition of the jury venire." Id.
 XIII.
The appellant contends that the state's evidence was insufficient to support his conviction. He preserved this issue for review by motions for a judgment of acquittal made at the close of the state's case-in-chief and after both sides had rested. In support of this contention, he argues that the fiber and hair evidence was "not conclusive as to having come from any common sources that was associated with Smith," that the evidence found at the scene was not "sufficiently" connected with the appellant, that there were "questions" concerning the tire tread evidence, and that Enfinger's testimony was not worthy of belief. He further argues that there was insufficient evidence to prove the kidnapping element of the crime. His contention of insufficiency is essentially based on the alleged lack of credibility of the state's witnesses.
The weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury. Morton v. State, 581 So.2d 562
(Ala.Cr.App. 1991); Ward v. State, 356 So.2d 238 (Ala.Cr.App.), cert. denied, 356 So.2d 242 (Ala. 1978). The action of the trial court in denying a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury at the time the motion was made from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199
(Ala.Cr.App. 1983). In determining whether there is sufficient evidence to support the ruling of the trial court in denying a motion for a judgment of acquittal, the evidence must be reviewed in the light most favorable to the prosecution.Faircloth v. State, 471 So.2d 485 (Ala.Cr.App. 1984), aff'd,471 So.2d 493 (Ala. 1985); Cumbo v. State, 368 So.2d 871
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). A defendant's guilt may be established by circumstantial evidence as well as by direct evidence. Chafin v. State, 333 So.2d 599
(Ala.Cr.App.), cert. denied, 333 So.2d 609 (Ala. 1976). As long as the circumstantial evidence points to the guilt of the accused, it will support a conviction as strongly as direct evidence. Agee v. State, 470 So.2d 1331 (Ala.Cr.App. 1985).
In the case now before us, we have examined the evidence presented by the state and, in so doing, have applied the standard of review set out above. The state's evidence is both direct and circumstantial, and as we have pointed out, guilt may be established by circumstantial evidence as well as direct evidence. The evidence presented by the state, along with reasonable and fair inferences to be drawn from it, was sufficient for the jury to find the appellant guilty beyond a reasonable doubt of the crime charged in the indictment, an element of which was kidnapping. The appellant's motions for a judgment of acquittal based on insufficient evidence were properly denied. The case was properly submitted to the jury and the evidence is sufficient to sustain the conviction. We have carefully examined the evidence presented by the state, and we do not agree with the appellant's assessment of it. We find it strong and convincing.
Tellis D. Hudson, a forensic scientist and expert in trace evidence, testified that he compared the tire tread marks at the site where the victim's body was found with the tire treads on the appellant's automobile, and found them to be of the same type, pattern, and size, and with the same degree of wear, both front and rear. He stated that the front tires on the automobile were Goodyear Blue Streak radials and the rear tires were Larame Easy Rider bias-ply tires. Hudson further testified that he could not make a positive match, but that his opinion was that the left rear and right front tread marks found at the location where the body was found could have been made by the left rear and right front tires on the appellant's vehicle. George Thomas Cadotte, a tire designer and expert, testified that the combination of tires on the appellant's automobile was unusual and dangerous — that the Blue Streak radial was primarily sold to police departments *Page 215 
and was designed for high speeds, and that the Easy Rider tire was an ordinary tire sold to the general public. The appellant's wife testified that the appellant had purchased the automobile from the Columbus, Georgia, police department; that when he purchased it, all four tires were Blue Streak radials; and that he later replaced the two rear tires with the Easy Rider brand tires.
John Kilbourn, a forensic scientist and expert in the comparison of hair and fibers, testified that his comparison of a black polyester fiber found on the inside of the victim's shirt and fiber from the trunk mat of the appellant's automobile showed them to be "identical." Kilbourn's analysis consisted of optical and chemical tests of the fibers. Kilbourn further testified that he found another rayon fiber found taken from the blue jeans the victim was wearing to be "exactly the same" as fibers on the trunk mat of the appellant's automobile. The trunk mat was made up of the two types of fibers compared. He stated that both of the fibers mentioned above found on the clothing of the victim could have come from the trunk mat in the appellant's automobile. He stated that the fact that the fibers contained a blue pigment that was unusual strengthened his opinion that they came from the same source.
A blue polypropylene fiber found on the inside of the victim's shirt was compared with fibers from the kick panel and shelf behind the rear seat in the appellant's automobile, and they were found to be "very similar." The fibers had unusual markings and the colors in the dye material of the fibers were "exactly the same." Kilbourn's stated that it was his opinion that the fiber found on the victim could have come from the kick panel and rear window area of the appellant's automobile.
Kilbourn compared a "clump of yellow fiberglass" found on the back of the jeans the victim was wearing and fiberglass from the floorboard of the appellant's automobile and found the samples to be "identical." He testified that the fibers "matched" and that the fiberglass found on the victim's jeans could have come from the fiberglass on the floorboard of the appellant's automobile.
A hair found on the front seat of the appellant's automobile was compared with the victim's hair and found to be "very, very similar." Kilbourn stated that he considered 15 to 20 different characteristics of the hair before arriving at his conclusion. He testified that the only difference in the hair found in the automobile and the victim's hair was the length. He gave his opinion that the hair found in the appellant's automobile could have come from the victim.
A dog hair found on the victim's clothing was compared with dog hair found in the appellant's automobile and hair from the appellant's dog, Rex, and found by Kilbourn to be "similar," sharing the same diameter, scale, pattern, and medulla. The appellant was known to take his dog with him in his automobile, and Enfinger testified that the appellant had told him that he had his dog with him when he committed the crime.
Kilbourn summarized his opinions as follows:
 "With regard to the fibers themselves, being the polyester and the rayon and the polypropylene and the fiberglass, based on my experience in working and examining thousands of fibers in hundreds of cases, it would be my opinion that with the type of combinations that we have — not only the fibers themselves but the debris that's on the fiber, such as the glue, the unusual nature of the polyester fiber, the blue pigment in the matrix, it would be my opinion that based on the fiber examination that the victim, or her clothing at least, was in this particular vehicle or some other location that you could obtain these particular fibers, an unusual black polyester fiber that was consistent with the trunk mat, the rayon fiber with the glue on it, the blue polypropylene fiber and the yellow fiberglass."
The state presented evidence to show that the appellant had time to leave work in Columbus, Georgia, at the time shown by his employment records and to get to Flowers Bait and Tackle Shop in time to commit the crime. The distances between the victim's residence, Flowers Bait and Tackle Shop, the site where the victim's body was found, and the location of the victim's shoes were relatively *Page 216 
short. The appellant lived in the area, was familiar with it, the roads, and the store. The only tire tread marks at the site where the victim's body was found were the same type as the treads on the tires on the appellant's vehicle. The victim's shoes were found on alongside U.S. Highway 280, approximately 4 or 5 miles from the appellant's residence and near the intersection with County Road 83, which leads to the appellant's residence.
Considering all the evidence together, including the similarity between the distinctive tire tread marks at the scene with the tire treads on the appellant's automobile, the unusual type and combination of the tires, the numerous different hairs and fibers found on the victim's body and clothing which either were "identical," "exactly the same," "matched," or "very similar" to hairs and fibers found in the appellant's automobile, and the appellant's admission to Enfinger that he committed the kidnapping and murder and his description in detail how he committed these acts, the evidence of the appellant's guilt is overwhelming.
 XIV.
The appellant contends it was error for the trial court to allow into evidence, through Enfinger's testimony, the fact that the appellant had pleaded guilty to a burglary that he had committed in Auburn and that he had received a sentence of life imprisonment without parole as a result of that conviction. The complained-of testimony, in pertinent part, is as follows:
 "Q. [Prosecutor]: Calling your attention to the defendant over here, James Wyman Smith, I'd ask you if you've ever seen him before?
"A. [Enfingerl: Yes, sir.
 "Q. Did you see him back in the fall and winter of 1984?
 "A. Saw him around the first of December, maybe the fourth or the fifth.
"Q. Where did you see the defendant?
 "A. He was placed in the cell with me at the Lee County Jail.
". . . .
 "Q. Did the defendant tell you what he was in that cell with you for?
"A. It had to do with an incident in Auburn.
". . . .
 "Q. All right. And were you and the defendant both sentenced the same day? "A. Yes, sir, I was sentenced in the morning and he was sentenced in the afternoon.
". . . .
"Q. What did the defendant plead guilty to?
"A. Pleaded guilty to burglary.
 "Q. All right. Did that involve the Auburn incident?
"A. Yes.
"Q. And what sentence did he receive?
"A. Life without parole.
 "Q. Now he pled guilty to that, didn't he? "A. Yes, sir.
 "Q. And that was the maximum sentence that he could have received at that time for burglary, wasn't it, life without parole? There was no greater sentence. He pled guilty to life without parole?
"A. Yes, sir.
"Q. He did not go to trial?
"A. No, sir.
 "Q. Did he tell you why he pled guilty to life without parole and did not go to trial? "A. He said that if he felt that if he would take this guilty plea on the burglary charge, that the authorities would forget about the Linda Talbert case and leave him alone about it.
"Q. And that's what he did?
"A. Yes, sir."
Any conduct or declaration of an accused having a relation to the offense charged, indicating a consciousness of guilt, is admissible as evidence against him. Conley v. State,354 So.2d 1172 (Ala.Cr.App. 1977). Clearly, the appellant's statement as testified to by Enfinger was an admission against the appellant's interest and indicates a consciousness of guilt in the kidnapping and murder of the victim. The facts that the appellant had pleaded guilty to a burglary and that he had been sentenced to life imprisonment without parole are relevant to *Page 217 
explain the appellant's admission of guilt to Enfinger. They were properly admitted into evidence.
The appellant also contends that it was error for the trial court to allow Michael Andrew Thee to testify regarding the police chase that resulted in the appellant abandoning his vehicle and fleeing the scene. Thee testified that he was employed as a uniformed patrol officer by the City of Auburn Police Department on December 4, 1984, and that he observed the appellant driving a white 1980 Dodge Saint Regis four-door automobile. He further testified that he followed the appellant's vehicle with the intent to stop the appellant and that a chase ensued. His testimony regarding the chase is as follows:
 "A. [Thee]: The chase initiated at the intersection of Glen Avenue and University Drive in Auburn and ended on Thompson Drive. From University Drive and Glen Avenue we proceeded east on Glen Avenue into the city limits of Opelika, which turns into Frederick Road, this road right out here by the Justice Center. We continued on Frederick Road to the, what was the old Junior Food store at the time, during this chase. I contacted the Opelika Police Department and asked them to set up a road block, which they did. And the defendant and his vehicle turned onto Thompson Drive in Opelika.
". . . .
 "Q. [Prosecutor]: Did the defendant's vehicle run into a cement truck?
"MR. JONES: Object unless he knows.
"A. Yes, sir, it did.
 "Q. And that's the road you're talking about is right out here beside the Justice Center, isn't it?
 "A. That collision actually occurred at the intersection of Frederick Road and what's known as Old Opelika Road.
 "Q. Okay. And at that point, did the defendant flee the vehicle?
"A. After the chase —
"MR. JONES: Object unless he knows.
 "A. — ended here on Thompson — I guess it's Thompson Drive, which is a deadend street.
 "Q. Okay. And after the defendant left the vehicle, what was done with the vehicle at that point in time?
 "A. It was secured until [the] investigator arrived on the scene."
The testimony regarding this chase was obviously related to the collateral offense of the burglary in Auburn that the appellant pleaded guilty to and for which he received a sentence of life imprisonment without parole. At the time Thee testified, the jury did not have the benefit of Enfinger's testimony of the appellant's admission of guilt and could have inferred from the chase only that the appellant either had committed a collateral crime or bad act or was fleeing because of having committed the crime for which he was charged in the instant case. It was error for the trial court to admit this testimony at this point in the trial because the testimony related to a collateral offense having no relation to the charged offense. However, in view of the fact that the jury learned of the collateral burglary offense by admissible evidence, i.e., Enfinger's testimony that the appellant had told him that he had pleaded guilty to the collateral crime in an effort to avoid prosecution for the kidnapping and murder of Linda Talbert, it is unlikely that the officer's testimony had any bearing on the outcome of the case. Thus, we hold that although it was error to allow the testimony, the error was harmless, because it did not affect a substantial right of the appellant. A.R.A.P. 45A.
 XV.
In accordance with Ala.R.App.P. 45A, we have examined the instant record for any plain error, whether or not brought to our attention or the attention of the trial court. We find no "plain error or defect in the proceedings," either in the guilt phase or in the sentence phases of the trial.
We have also reviewed appellant's sentence in accordance with the provisions of § 13A-5-53, Code of Alabama 1975. Section 13A-5-53(a) requires that, in addition to reviewing the case for any error involving the conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: *Page 218 
(1) whether any error adversely affecting the rights of the defendant was made in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by us of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted the appellant of the capital offense charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45
and -46. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to any finding of aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury, by a vote of 11 to 1, returned the following verdict: "We, the jury, recommend that the defendant, James Wyman Smith, be punished by death."
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, to aid it in determining whether it would sentence the appellant to death as recommended by the jury or to life imprisonment without the possibility of parole. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any mitigating circumstance found to exist under § 13A-5-52, as well as written findings of fact summarizing the crime and the appellant's participation in it.
In its findings of fact, the trial court found the existence of the following aggravating circumstance: "[T]hat the capital offense was committed while the defendant was engaged in the commission of or flight after committing, or attempting to commit kidnapping." § 13A-5-49(4). The trial court examined the evidence for mitigating circumstances, pursuant to the requirements of §§ 13A-5-51 and -52, and found none. The trial court considered all of the evidence presented, arguments of counsel, and the presentence report along with the advisory verdict of the jury and weighed the aggravating circumstance against the total lack of mitigating circumstances, and sentenced the appellant to death. In weighing the aggravating circumstance against the lack of any mitigating circumstances, the trial court stated,
 "The Court finds there is nothing about the defendant, his character, his prior accomplishments, or lack thereof, any trait of character or any other mitigating circumstance in any way connected with the defendant or his life or the offense for which he was convicted which serve or should serve to mitigate the sentence of death."
The appellant was convicted of the offense of murder committed during a kidnapping in the first degree, a capital offense under Alabama law. § 13A-5-40(a)(1). We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Musgrove v. State,519 So.2d 565 (Ala.Cr.App.), aff'd, 519 So.2d 586 (Ala. 1986), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988);Heath v. State, 455 So.2d 898 (Ala.Cr.App. 1983), aff'd,455 So.2d 905 (Ala. 1984), aff'd, 474 U.S. 82, 106 S.Ct. 433,88 L.Ed.2d 387 (1985); Callahan v. State, 557 So.2d 1292
(Ala.Cr.App.), aff'd, 557 So.2d 1311 (Ala. 1989), cert. denied,498 U.S. 881, 111 S.Ct. 216, 112 L.Ed.2d 176 (1990).
After carefully reviewing the record of both the guilt and the sentence phases of appellant's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. We conclude that the findings and *Page 219 
conclusions of the trial court are amply supported by the evidence. We concur in the recommendation of the jury and in the judgment of the trial court that death is the appropriate sentence in this case. Our independent weighing of the aggravating circumstance with the absence of mitigating circumstances convinces us that the sentence of death is appropriate in relation to this defendant. Considering the crime committed and the defendant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All Judges concur.
[1] The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors. The decision to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. Code of Alabama 1975, § 13A-5-46(b).
[2] While the jury's recommendation concerning the sentence shall be given consideration, it is not binding upon the trial court. § 13A-5-47(e).
[3] This appeal is from the second trial of this case. In the first trial, the jury returned a verdict of guilty of the capital offense charged and unanimously recommended the imposition of the death penalty. The trial court accepted the recommendation and sentenced the appellant to death. On appeal, we affirmed the conviction and sentence, Smith v. State,581 So.2d 497 (Ala.Cr.App. 1990). However, the Alabama Supreme Court reversed our judgment and ordered the case remanded for a new trial because of certain prejudicial comments by the prosecutor during the closing arguments in the guilt phase of the trial and because of the wrongful admission of evidence of a collateral crime. Ex parte Smith, 581 So.2d 531 (Ala. 1991).
[4] In considering what constitutes plain error in a capital case, we have adhered to the interpretation of the term "plain error" adopted by the Alabama Supreme Court, which follows the interpretation given that term by the federal courts. See Exparte Harrell, 470 So.2d 1309 (Ala.), cert. denied,474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985); Ex parte Womack,435 So.2d 766 (Ala.), cert. denied, 464 U. 986, 104 S.Ct. 436,78 L.Ed.2d 367 (1983). See also Hooks v. State, 534 So.2d 329
(Ala.Cr.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). Plain error is error that "has or probably has adversely affected a substantial right of the appellant," Ala.R.App.P. 45A, or is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. Ex parte Womack. The failure to object at trial weighs against any claim of prejudice an appellant may make.Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd,577 So.2d 531 (Ala. 1991).
[5] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770,20 L.Ed.2d 776 (1968), set the early standard for a court's exclusion for cause of venirepersons who oppose the death penalty. The Court in dicta in Witherspoon limited exclusion for cause to those venirepersons who made it "unmistakably clear (1) that they would automatically vote against imposition of capital punishment . . . or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." Id. 522-23 n. 21,88 S.Ct. at 1777 n. 21. Subsequently, in Wainwright v. Witt,469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Court clarified or modified its decision in Witherspoon by holding that the state may exclude venirepersons in capital cases whose views would " 'prevent or substantially impair the performance of [their] duties as a juror in accordance with his instructions and [their] oath.' " Id., 469 U.S. at 424,105 S.Ct. at 852 (quoting Adams v. Texas, 448 U.S. 38, 45,100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The new Witt standard dispensed with the Witherspoon reference to "automatic" decisionmaking, and eliminated the requirement that a venireperson's bias be proved with "unmistakable clarity."469 U.S. at 424, 105 S.Ct. at 852.
[6] Because the crime was committed in an area of Lee County near the county line between Lee and Russell Counties, some Russell County law enforcement officers were initially involved in the investigation.
 On Application for Rehearing