James Wyman Smith was indicted in Lee County for the murder of Linda Darlene Talbert, a murder committed during a kidnapping and thereby made capital pursuant to §13A-6-40(a)(1), Ala. Code 1975. He has been twice tried and convicted on that charge.
In the first trial, the jury found Smith guilty of the capital offense charged and the court sentenced him to death. The Court of Criminal Appeals affirmed. Smith v. State,581 So.2d 497 (Ala.Crim.App. 1990). We reversed, granting a new trial because the prosecutor had made improper prejudicial comments during closing arguments in the guilt phase and because the trial court had wrongly admitted evidence of a collateral crime. Ex parte Smith, 581 So.2d 531 (Ala. 1991).
At his second trial, Smith was again convicted and he was again sentenced to death. The Court of Criminal Appeals affirmed. Smith v. State, 698 So.2d 189 (Ala.Crim.App. 1996). We granted certiorari review as a matter of right, pursuant to Rule 39(c), Ala.R.App.P. We affirm.
The underlying facts are as follows: Linda Darlene Talbert was abducted from her place of employment, a convenience store in the Smiths Station community in Lee County in August 1984. Her nude body was discovered three days later in a field several miles from the store. She had been strangled with her brassiere and pantyhose. A dog hair, fiberglass, and carpet fibers were found on the body; they were taken to the crime laboratory. Vaginal swabs and samples of Linda Talbert's hair were also sent to the crime lab. The police discovered automobile tire prints at the scene.
In December 1984, Smith was arrested in Auburn for burglary. After the burglary, Smith had eluded police and had abandoned *Page 221 
the car he was driving. Smith pleaded guilty to burglary and was sentenced to prison. The police impounded the car, the title to which was in the name of Smith's wife, for insurance purposes. While the car was impounded, Smith's wife consented to a search of the car. The tire prints on the car matched the tire prints taken from the field were Linda Talbert's body was found. Hair, fiberglass, and carpet fiber samples were removed from the car for examination in the crime lab.
At Smith's murder trial, the State's expert witnesses on the physical evidence testified that the fiberglass and carpet fibers found on Talbert's body were similar to the fiberglass and carpet in Smith's car. The hair found in Smith's car, they said, was, "very, very similar" to hair taken from Talbert's body. The dog hair found on Talbert's body was very similar to the hair of the Smiths' family pet. No DNA testing was done on the human hair found in Smith's car, because there was no root; that is where DNA cellular material would be found. Vaginal swabs taken from Talbert's body were inconclusive as to the presence of semen. According to the State's expert, Talbert's body was found nude and in a position consistent with a sexual battery.
Smith's prison cellmate, Marion Enfinger, testified at Smith's first trial. He had died of bone cancer before Smith's second trial. At the second trial, Enfinger's testimony from the first trial was read into the record. When he testified, Enfinger was in prison for obtaining prescription drugs by fraud. He testified that he did not receive any promises or deals from the district attorney in exchange for his testimony.
Enfinger stated that while he was sharing a cell with Smith, Smith told him that he had kidnapped Talbert at gunpoint from the convenience store; that he had used the same gun in the Auburn burglary; and that his dog was in the car when he kidnapped Talbert. According to Enfinger, Smith said that he drove Talbert to a vacant field and there attempted to have sexual intercourse with her, but could not perform; then, according to Enfinger, Smith said he choked Talbert with her bra and pantyhose.
Smith raises 14 issues for this Court's review, all of which were raised before the Court of Criminal Appeals and were discussed in that court's lengthy opinion. We have carefully reviewed the record for plain error, in accordance with Rule 39(k), Ala.R.App.P., and have found none. We discuss here two issues that were raised before the Court of Criminal Appeals.
The first issue is whether trial court erred in failing to allow Smith to ask certain reverse-Witherspoon questions to the prospective jurors. Witherspoon v. Illinois, 391 U.S. 510,88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), allows the prosecution in a capital case to strike for cause those potential jurors who would automatically vote against imposing capital punishment without regard to any evidence that might be developed at trial or those potential jurors whose attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. In Wainwright v. Witt, 469 U.S. 412,105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court held that in a capital case the prosecutor may exclude venirepersons whose views would "prevent or substantially impair" their performance of their duty as a jurors.
In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222,119 L.Ed.2d 492 (1992), the Supreme Court held that it violated the requirements of due process to allow the prosecution to strike for cause persons who are opposed to the death penalty while not allowing the defense to exclude for cause those venirepersons who are predisposed to impose capital punishment regardless of the evidence presented. Thus, a capital defendant may challenge for cause any venireperson who would automatically vote to impose death if the defendant was convicted of a capital crime. A capital defendant may ask to inquire of the prospective jurors' views on capital punishment, so as to identify jurors predisposed to impose capital punishment; jurors who are unalterably in favor of the death penalty and, therefore, unable to follow the law, should be disqualified. The defendant is entitled to a new trial if one such predisposed person remains on the jury and the defendant is convicted. *Page 222 
Smith admits that the trial court allowed him to ask reverse-Witherspoon questions to some of the prospective jurors, but he says he was not allowed to ask the questions of all the jurors. Smith further argues that the trial court erred in interceding and asking its own reverse-Witherspoon
questions.
The trial court administered the oath to the venire, had each venireperson identify himself or herself, and then began asking general voir dire questions to the entire venire. (R.T. 435-440.) The court asked "Do you have a fixed opinion against punishment which would include death or imprisonment in the penitentiary?" (R.T. 446.) Six venirepersons raised their hands; the trial court noted their names, in order to question them on this issue later. The trial court then continued to ask questions of the venire as a whole.
The potential jurors who had raised their hands in response to any of the trial court's questions remained in the room while the others left the room. The court and counsel questioned the jurors separately regarding their opinions on capital punishment, and four were struck for cause. (R.T. 460-500.) The court then divided the venire into 5 panels of 14 members each and allowed counsel to conduct further voir dire examination. The trial court told counsel to ask general questions to each panel and told them that it would allow them to examine the jurors "individually to whatever extent you wish, within reason." (R.T. 433.) The judge also instructed counsel to ask questions of the panel and said, "[T]hen if you have any questions that might relate to any individual juror, I will give you the opportunity to question them outside the presence of the others." (R.T. 531.)
The voir dire examination lasted three 8-hour days, and it makes up 1400 pages of the record. Each panel was asked general questions, and many jurors were examined individually. Most of the questions were asked by defense counsel. During voir dire, three more venirepersons indicated that they had a problem with imposing capital punishment, and they were subsequently struck from the jury. (R.T. 686-92, 709-16, 737-42.)
Smith contends that the trial court initially allowed him to ask reverse-Witherspoon questions, but stopped him before he had questioned all prospective jurors. Smith contends that this was error under Morgan. In Morgan, the trial court refused to allow defense counsel to ask specifically whether any of the potential jurors would automatically vote for the death penalty. Instead, the trial court asked general questions about the veniremembers' ability to be fair and impartial. The Supreme Court held that on voir dire a trial court must, at the defendant's request, inquire as to whether prospective jurors would automatically impose the death penalty.
After reviewing the record, we conclude that Smith was allowed to ask reverse-Witherspoon questions in accordance withMorgan. On occasions, Smith's reverse-Witherspoon questions were misleading or confusing. On those occasions, the trial court interceded and asked questions as to whether the potential juror would automatically impose the death penalty. For example, the following occurred when Smith was conducting individual voir dire of potential Juror H.:
 "SMITH'S COUNSEL: A capital murder trial is a two-tiered trial. There is a guilt phase and if there is a guilt finding, then there is a penalty phase. During the guilt phase the jurors will determine whether or not they believe he's guilty of capital murder, guilty of some lesser included offense, or not guilty. Now, if the jurors vote to find Mr. Smith guilty of capital murder during the guilt phase, then there would be a second trial as to the penalty phase. At that second trial the jury would vote to make a recommendation to the judge or to the court, as to what they, the jury, think the punishment should be. If you voted that Mr. Smith was guilty of capital murder during the guilt phase, would you automatically vote for the death penalty during the penalty phase or not?
"PROSECUTOR: We object to the form of —
"COURT: Do you understand —
"PROSECUTOR: — that question, again.
"COURT: — the question, Mr. H.? *Page 223 
"PROSECUTOR: It misstates what goes on —
"JUROR: Could you repeat that again —
"PROSECUTOR: — in the punishment stage.
"COURT: Let me ask it in a different way.
"SMITH'S COUNSEL: Well, Judge —
"COURT: Okay. Well, ask the question —
"SMITH'S COUNSEL: Did you sustain his objection?
"COURT: I did not.
"SMITH'S COUNSEL: Okay.
 "COURT: The witness — the juror said he didn't understand what the question was.
 "SMITH'S COUNSEL: I couldn't hear him. [The prosecutor] was talking over there. May I explain it again?
"JUROR: Yes, sir, please.
 "COURT: Ask him a question, please. Don't try to explain the whole thing. Break it down into —
 "SMITH'S COUNSEL: If during the guilt phase —
"COURT: To where it is understandable —
 "SMITH'S COUNSEL: — you voted along with the other eleven jurors that Mr. Smith was guilty of capital murder, then during the penalty phase would you automatically vote for the death penalty or not?
"PROSECUTOR: Objection to the form —
"COURT: Okay —
"PROSECUTOR: — of the question.
"COURT: Yeah, sustained as to the form.
"SMITH'S COUNSEL: All right, if you —
"COURT: If you got to that point —
"SMITH'S COUNSEL: — let me ask it again —
 "COURT: — if you got to that point, Mr. H., there would be two options. If death or life without parole, would you automatically vote for death?
"JUROR: Not automatically.
"COURT: You would consider and could vote —
"JUROR: Yes, I would have to —
 "COURT: — if the facts and circumstances and the law were such you could vote for life without parole; is that what I'm saying [sic]?
"JUROR: Right.
 "COURT: Or what you're saying? Okay. Next question. You can ask him the question in your own words if you want to.
 "SMITH'S COUNSEL: The defense takes exception to the court's sustaining of the state's objection.
 "COURT: The witness said — indicated he didn't understand the question . . ., is the main thing.
"SMITH'S COUNSEL: Judge, that was —
 "COURT: He can ask the question again if he wants to."
(R.T. 908-13.)
Smith was not prohibited from asking reverse-Witherspoon questions of the venire; rather, the trial court encouraged such questions and merely clarified those that were confusing or misleading. We hold that the trial court did not abuse its discretion in regard to those questions.
Smith contends that the trial court made his counsel "look poorly" in front of the jury on voir dire by interrupting the questioning. Specifically, Smith contends that the trial court denied a proper voir dire examination by stating to Smith's attorney in front of the venire: ". . . [G]o ahead! Come on! Talk faster. I know what you're talking about." (R.T. 588.) We note that in fact these statements were not made before the jury, but were made outside the jury's presence. They, therefore, did not prejudice Smith.
At oral argument before this Court, Smith stressed the argument that Alabama's system for compensating attorneys appointed to represent indigent defendants is unconstitutional. Smith contends that § 15-12-21, Ala. Code 1975, violates the Due Process and Equal Protection Clauses of the federal constitution; that it violates the state law doctrine of separation of powers; that it is an unconstitutional taking of property without due process of law; and that it deprives indigent defendants of effective assistance of counsel.
First, we note that the record reflects that at trial Smith was ably represented by *Page 224 
experienced counsel. Also, Smith's counsel admitted at oral argument before this Court that Smith's rights were not infringed upon by the application of the statute, because, counsel conceded, counsel had zealously prepared and had zealously represented Smith at both trials. This fact is also apparent from the number of hours claimed as out-of-court work performed by counsel in preparing for trial. We find nothing in the record to indicate that counsel's efforts were hindered in any way by the fact that the statute limited the fees and expenses allowed. The trial court also stated that Smith's counsel had done an "excellent job" for their client. Therefore, we cannot say that Smith's rights were violated by the application of Alabama's statutory system of compensating counsel for indigent defendants.
Second, we note that counsel appointed in a capital murder case are entitled to fees not available to other appointed counsel. Section 15-12-21(d) provides in pertinent part as follows:
 "The amount of such fee shall be based on the number of hours spent by the attorney in working on such case and shall be computed at the rate of $40.00 per hour for time expended in court and $20.00 per hour for time reasonably expended out of court in the preparation of such case. The total fees to any one attorney in any one case, from the time of the appointment through the trial of the case, including motions for new trial, shall not, however, exceed $1,000.00, except as follows: In cases where the original case involves a capital offense or a charge which carries a possible sentence of life without parole, the limits shall be $1,000.00 for out-of-court work, plus payment for all in-court work, said work to be billed at the aforementioned rates. Counsel shall also be entitled to be reimbursed for any expenses reasonably incurred in such defense to be approved in advance by the trial court. Retrials of a case shall be considered a new case."
Thus, counsel are entitled to fees for all in-court work. The $1,000 cap Smith claims is unconstitutional applies only to fees for an attorney's out-of-court work. This does not mean that counsel may not be entitled to payment of certain other out-of-court expenses.
In May v. State, 672 So.2d 1307 (Ala.Crim.App. 1993), writ quashed, 672 So.2d 1310 (Ala. 1995), this Court refused to reexamine our holding that the statutes concerning attorney fees for those appointed to represent indigent defendants did not infringe upon the constitutional rights of the defendant. However, this Court's order quashing the writ of certiorari inMay had the effect of leaving unreviewed the holding by the Court of Criminal Appeals that an appointed lawyer is entitled to expenses for office overhead reasonably incurred and reasonably calculated in representing a defendant. We agree with the Court of Criminal Appeals' holding in May that §15-12-21 authorizes payment to a court-appointed attorney for overhead expenses reasonably incurred in defense of an indigent defendant.
The Court of Criminal Appeals, in Ex parte Barksdale,680 So.2d 1029, 1030-31 (Ala.Crim.App. 1996), stated:
 "The best practice would be for counsel, when submitting a motion for preapproval of extraordinary expenses that relate to office overhead, to include a rough estimate of the hours counsel expects to spend on the case and an hourly rate that represents counsel's estimate of office overhead expenses incurred in the operation of counsel's law practice."
In Barksdale, the court cited an attorney general's opinion that implied, as did the statute, "that a fixed amount must be preapproved by the court before expenses may be reimbursed by the State Comptroller's office." 680 So.2d at 1030.
Smith's counsel requested payment of extraordinary expenses associated with the trial in this case. (C.R.260, 398, 401, 407, 413, 452, 482.) Because counsel's request relates to the second trial of this case and because counsel made the request for payment of certain overhead expenses before the second trial, we will allow counsel to submit a list of expenses to the trial court, as recommended inBarksdale, for the trial court to determine whether those overhead expenses *Page 225 
were reasonably incurred in regard to Smith's second trial.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, COOK, BUTTS, and SEE, JJ., concur.