WISE, Presiding Judge.
 

 The appellant, Beryl R. Hiler, was convicted of falsely reporting an incident, a violation of § 13A-11-11, Ala.Code 1975, and menacing, a violation of § 13A-6-23, Ala.Code 1975.
 
 [1]
 
 The trial court sentenced him to serve concurrent terms of six years in prison on the falsely reporting conviction and six months in jail on the menacing conviction. Hiler filed a motion for a new trial, which the trial court summarily denied. This appeal followed.
 

 The State presented evidence that Hiler had previously been married to Michelle Noble, that Michelle later married Greg Noble, and that Michelle was allowing Hiler to stay at the residence with them. On
 
 *537
 
 May 25, 2006, Hiler and Michelle argued. Later, law enforcement officers were called to the residence.
 

 Deputy Mike Hill of the Franklin County Sheriffs Department testified that, on May 25, 2006, Sheriff Larry Plott asked him to go to the Noble residence because Michelle wanted Hiler removed from her residence. When he arrived, he spoke to Michelle and Greg. Michelle advised him that she had allowed Hiler to stay at the residence, that Hiler had come in early that morning and was under the influence of some type of drug, and that she wanted Hiler removed from the residence.
 

 Hill testified that, when he arrived, Hiler was sitting on a chair at an outbuilding that was approximately 100 meters from the house. After speaking to Michelle, he got into his patrol vehicle and drove toward the outbuilding. As Hill was driving up, Hiler went into the outbuilding. When he got out of his patrol vehicle, Hiler walked back out with a device in his hand and held it up to show it to him. Hill testified that he was stunned and knew from his previous training and experience with explosives that it looked like Hiler was holding some type of explosive device. He asked Hiler what the device was, and Hiler replied that it was an explosive and said, “ ‘It’s a bomb.” ’ (R. 26.) Hill then got into his vehicle and went back to the Noble residence.
 

 Hill testified that he telephoned Plott, his supervisor, and dispatch and advised them about the situation. He also testified that Hiler began to walk up the hill to the Noble residence with the device in his hand, that he ordered Hiler to stop, that Hiler did not stop, that he drew his weapon and pointed it at Hiler, that he ordered Hiler to stop and stay at a distance, and that Hiler finally stopped and went back to the outbuilding.
 

 Hill testified that other officers responded to the situation and that he told his supervisor to notify the special response team about the situation. The officers ultimately devised a plan to approach Hiler. Hill testified that he and Jason Holcomb attempted to talk to Hiler, but they could not get very close because there was a fence between them. At one point, Hiler came out of the outbuilding and had the device attached to his waist. Hiler also indicated to them that he had a mercury switch on the device.
 

 Hiler and Holcomb negotiated, and Hiler agreed to put the device down if Holcomb would leave his gun in his vehicle. Holcomb put his gun in his vehicle and obtained a stun gun instead, and Hiler laid the bomb down and walked a short distance from it. Holcomb attempted to use the stun gun on Hiler, but was not able to do so, and Hiler ran toward the device. At that point, Hill and another deputy ordered Hiler to stop and started shooting at him when he did not stop. Afterward, they removed Hiler from the area, arrested him, and handcuffed him.
 

 Hill testified that, at some point, Hiler stated that his ex-wife was trying to take his children away from him. He also stated that he “didn’t care to die.” (R. 81.)
 

 Hill testified that he did not have any reason to believe the device was not a real explosive device. He also testified that he “[djefinitely” feared for his own safety and was afraid he could be injured or killed by the device. (R. 41.) Finally, he testified that, at some point during the incident, the officers decided to get Michelle and Greg out of their house.
 

 Captain Mark Swindle of the Franklin County Sheriffs Department testified that he went to the Noble residence on May 25, 2006, and saw Hiler and Hill talking from opposite sides of a fence. At that time, Hiler had a “pipe-looking device” strapped
 
 *538
 
 to his person, and he heard Hiler say that it was a bomb and that he had a mercury switch. Holcomb talked Hiler into putting the bomb down and then attempted unsuccessfully to use a stun gun on Hiler. Hiler then ran back toward the device. He and Hill yelled for Hiler to stop and shot at him. Hiler then stopped, put his hands up, and said, “‘It’s not real.’” (R. 101.)
 

 Swindle testified that the Noble residence was about 50 yards away from the outbuilding where Hiler was. He also testified that they evacuated the residence for safety reasons.
 

 Investigator Jason Holcomb of the Franklin County Sheriffs Department testified that he went to the Noble residence on May 25, 2006. When he first got there, he spoke to Hiler, and Hiler told him he was upset because he was going to have to move from the residence and would not be able to see his children. Holcomb testified that Hiler told him that the device was a bomb, that he had a switch that would make it explode, and that he had made and exploded bombs before. He eventually placed his gun in his vehicle and obtained a stun gun, and Hiler put the device on the ground. When Hiler turned away, Holcomb attempted to use the stun gun on him, but was not able to, and Hiler ran toward the device. Ultimately, other officers shot Hiler and took him into custody. At that time, Hiler apologized and said that the device was not a real bomb.
 

 Sergeant Chris Ticer testified that he is a bomb technician with the Florence Police Department and that he responded to the scene after Hiler had been secured. When he arrived, he found the device Hiler had had and attached a disruption device to it to disable it. Ultimately, Ticer determined that the device was not a threat or an explosive. However, he testified that, if he had seen the device hanging from a person’s neck and nothing more, he would not have been able to tell if it was capable of exploding.
 

 Corporal Robert Heeschen testified that he is employed by the Alabama Bureau of Investigation as an explosive technician and that he went to the scene to gather the remains of the device. Based on the parts he found, he testified that it appeared that someone had tried to make the device appear to be a functional explosive device and that, from a distance, he would not have been able to determine whether the device was actually an explosive device. During his investigation, Heeschen found several items that could be used in making an explosive device.
 

 Corporal Bill Burke of the Alabama Bureau of Investigation testified that he interviewed Hiler about the incident. At that time, Hiler stated that he lived with his ex-wife and her husband, that he had been fired that day, that his ex-wife had told him he would have to move out, and that his ex-wife had hit him with the telephone when she called law enforcement officers about him. Hiler also stated that he went to the outbuilding and built a pipe bomb, that he had built bombs before when he lived in Kentucky and had detonated them in the woods, that he had told his ex-wife earlier that day that he wanted to commit suicide by cop, and that he was sorry he made the officers shoot him.
 

 Finally, the State presented evidence that Hiler repeatedly apologized and indicated that he did not have any hard feelings toward the law enforcement officers who responded to the scene and that he knew they were just doing their jobs.
 

 Michelle Noble testified that she was married to Greg Noble, that she and Hiler had previously been married and had a son together, and that they allowed Hiler to live with them because her son did not do well when his father was not around. She
 
 *539
 
 also testified that, on May 25, 2006, she gave Hiler a ride to the house because he had been fired earlier that day for being late to work. Michelle stayed at the house with Hiler for the rest of the day and they argued because Hiler was drinking, even though she did not allow alcohol in the home.
 

 Michelle testified that, at some point that day, Hiler went to the white outbuilding where he and their son spent a lot of time. She also testified that Hiler and their son were building a time capsule in a pipe, that they had remote controlled cars in the building, and that they built model airplanes in the building.
 

 Michelle testified that a 911 operator telephoned her home and stated that a “Bo Hiler” had reported a domestic dispute and that an officer was on his way to her home. She told the operator that they were arguing, but that there was not a domestic dispute in progress. Michelle then telephoned Sheriff Plott and told him she just wanted someone to take Hiler to a motel so that he could sleep it off.
 

 Michelle testified that Hiler was sitting on the porch of the outbuilding when a deputy arrived, that she talked to the deputy briefly, and that the deputy went to speak with Hiler. Shortly thereafter, Hiler stood up and went to the doorway of the outbuilding, and the deputy started backing up. She approached the deputy and asked why he was not taking Hiler with him, and the deputy stated that Hiler had a bomb. Michelle testified that she and Greg told several of the law enforcement officers that the object was a time capsule rather than a bomb and that Greg offered to take it from Hiler. Finally, she testified that they were ordered into the house for safety reasons and were later ordered to leave the house.
 

 Hiler testified that, on May 25, 2006, he was fired from his job, that he started drinking, that he argued with Michelle, that she threatened to take his son, that he went to the outbuilding, that he telephoned 911, and that he went back to the outbuilding. He also testified that a deputy arrived, that he was at the outbuilding and had a pipe in his hand, that the officer asked what it was, that he told the deputy it could blow up, that the deputy backed up, and that he realized the deputy thought that it was a bomb. Hiler testified that more officers arrived and tried to convince him to put the pipe down, that he agreed to put it down if one of the officers put his gun down, that the officer did put his gun down, that the officer shot him with a stun gun, that he ran, and that the officers shot him.
 

 Hiler testified that he never told the officers he had a bomb, that he only stated that the pipe could blow up, and that he said that because he wanted the deputy to leave him alone and to scare Michelle. He also testified that, after the officer tried to use the stun gun on him, he ran to get away and not to get the pipe. Hiler further testified that he strapped the device to himself to keep the officers from shooting him. However, he also stated that he did all of the things to get shot because he was despondent about not seeing his son.
 

 I.
 

 Hiler argues that the trial court erred in denying his motion for a judgment of acquittal on the falsely reporting an incident charge.
 

 “A person commits the crime of falsely reporting an incident if with knowledge that the information reported, conveyed or circulated is false, he or she initiates or circulates a false report or warning of an alleged occurrence or impending occurrence of a fire, bomb, explosion, crime, catastrophe, or emergency under circumstances in which it is likely to
 
 *540
 
 cause evacuation of a building, place of assembly, or transportation facility, or to cause public inconvenience or alarm.”
 

 § 13A-ll-ll(a), Ala.Code 1975. The Commentary to § 13A-11-11, Ala.Code 1975, provides, in part:
 

 “Although the Criminal Code does not make intent an element of the offense, knowledge that the information reported, conveyed or circulated was false is required. It is also necessary that the false information be initiated or circulated under circumstances in which it is likely to cause evacuation of a building, place of assembly, or transportation facility, or to cause public inconvenience or alarm.
 

 “The Criminal Code seeks to cover instances in which a false report is made to public officials
 
 not engaged in police
 
 or fire control
 
 activities,
 
 for instances, school administrators, airline officials, or managers of public buildings. The primary purpose of § 13A-11-11 is to protect the public against inconvenience or alarm, and
 
 not to protect against interference with governmental operations;
 
 this is the purpose of §§ 13A-10-8 and 13A-10-9.”
 

 (Emphasis added.)
 

 Hiler specifically contends that his conduct did not fall within the purview of § 13A-11-11, Ala.Code 1975, because “[t]he evidence is undisputed that any alleged false report made by [him] was made to police officers who were engaged at the time in police activities.” (Hiler’s brief at p. 17.) We agree. The Commentary to § 13A-11-11, Ala.Code 1975, specifically explains that the statute was intended to apply to false reports made to public officials who were not engaged in police activity. It also explains that the primary purpose of the statute is to protect the public from inconvenience or alarm and that the purpose of §§ 13A-10-8 and 13A-10-9, Ala.Code 1975, is to protect against interference with governmental operations. The evidence in this case clearly established that any false representation Hiler made about having a bomb was directed to law enforcement officers who were engaged in law enforcement activities. Therefore, based on the plain language of the Commentary to § 13A-11-11, Ala. Code 1975, we conclude that the statute was not intended to apply to facts such as those in this case.
 
 Compare Avanrenren v. City of Huntsville,
 
 597 So.2d 239, 240-41 (Ala.Crim.App.1992) (holding that § 13A-11-11, Ala.Code 1975, was not intended to apply to cases in which the facts do not establish that the public was inconvenienced as a result of the defendant’s conduct).
 
 [2]
 
 Accordingly, the trial court erred in denying Hiler’s motion for a judgment of acquittal as to the falsely reporting an incident charge.
 

 II.
 

 Hiler also argues that the trial court erred in denying his motion for a judgment of acquittal on the menacing charge. Specifically, he contends that he did not make any threats of bodily harm to or take any physical action toward Hill, the alleged victim of the offense.
 

 “A person commits the crime of menacing if, by physical action, he intentionally places or attempts to place another person in fear of imminent serious physical injury.”
 

 § 13A-6-23(a), Ala.Code 1975.
 

 “In deciding whether there is sufficient evidence to support the verdict
 
 *541
 
 of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution.
 
 Cumbo v. State,
 
 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). Conflicting evidence presents a jury question not subject to review on appeal, provided the state’s evidence establishes a prima facie case.
 
 Gunn v. State,
 
 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). The trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the appellant guilty.
 
 Thomas v. State,
 
 363 So.2d 1020 (Ala.Cr.App.1978). In applying this standard, the appellate court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt.
 
 Willis v. State,
 
 447 So.2d 199 (Ala.Cr.App.1983);
 
 Thomas v. State.
 
 When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for a judgment of acquittal by the trial court does not constitute error.
 
 Young v. State,
 
 283 Ala. 676, 220 So.2d 843 (1969);
 
 Willis v. State.”
 

 Breckenridge v. State,
 
 628 So.2d 1012, 1018 (Ala.Crim.App.1993).
 

 “‘In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.’
 
 Faircloth v. State,
 
 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed,
 
 Ex parte Faircloth,
 
 [471] So.2d 493 (Ala.1985).
 

 [[Image here]]
 

 “ ‘ “The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is
 
 legally
 
 sufficient to allow submission of an issue for decision to the jury.”
 
 Ex parte Bankston,
 
 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury’s verdict only where it reaches “a clear conclusion that the finding and judgment are wrong.”
 
 Kelly v. State,
 
 273 Ala. 240, 244, 139 So.2d 326 (1962).... A verdict on conflicting evidence is conclusive on appeal.
 
 Roberson v. State,
 
 162 Ala. 30, 50 So. 345 (1909). “[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense.”
 
 Fuller v. State,
 
 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied,
 
 Fuller v. Alabama,
 
 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (I960).’
 
 Granger [v. State],
 
 473 So.2d [1137,] 1139 [ (Ala.Crim.App.1985) ].
 

 “... ‘Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.’
 
 White v. State,
 
 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). ‘Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.’
 
 Cochran v. State,
 
 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds,
 
 Ex parte Cochran,
 
 500 So.2d 1179 (Ala. 1985).”
 

 
 *542
 

 White v. State,
 
 546 So.2d 1014, 1017 (Ala.Crim.App.1989). Also,
 

 “ ‘[c]ircumstantial evidence is not inferior evidence, and it will be given the same weight as direct evidence, if it, along with the other evidence, is susceptible of a reasonable inference pointing unequivocally to the defendant’s guilt.
 
 Ward v. State,
 
 557 So.2d 848 (Ala.Cr.App.1990). In reviewing a conviction based in whole or in part on circumstantial evidence, the test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.
 
 Cumbo v. State,
 
 368 So.2d 871 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala. 1979).’
 

 “Ward,
 
 610 So.2d at 1191-92.”
 

 Lockhart v. State,
 
 715 So.2d 895, 899 (Ala.Crim.App.1997). Further,
 

 “ ‘[ijntent, ... being a state or condition of the mind, is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.’
 
 McCord v. State,
 
 501 So.2d 520, 528-529 (Ala.Cr.App.1986), quoting
 
 Pumphrey v. State,
 
 156 Ala. 103, 47 So. 156 (1908).”
 

 French v. State,
 
 687 So.2d 202, 204 (Ala.Crim.App.1995), aff'd in part, rev’d in part on other grounds, 687 So.2d 205 (Ala.1996).
 

 “ ‘The question of intent is hardly ever capable of direct proof. Such questions are normally questions for the jury.
 
 McMurphy v. State,
 
 455 So.2d 924 (Ala.Crim.App.1984);
 
 Craig v. State,
 
 410 So.2d 449 (Ala.Crim.App.1981), cert. denied, 410 So.2d 449 (Ala.1982).’
 
 Loper v. State,
 
 469 So.2d 707, 710 (Ala.Cr.App.1985).”
 

 Oryang v. State,
 
 642 So.2d 989, 994 (Ala.Crim.App.1994).
 

 Based on the evidence presented, the jury could have reasonably concluded that Hiler took physical action when he showed the device to Hill and told him it was a bomb and when he ran toward the device after Holcomb unsuccessfully attempted to use a stun gun on him.
 
 See Oliver v. City of Opelika,
 
 950 So.2d 1229 (Ala.Crim.App.2006) (holding that there was sufficient evidence of physical action where the defendant pointed a gun at an officer). Therefore, it could have reasonably concluded that Hiler was guilty of the offense of menacing. “[T]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury.”
 
 Smith v. State,
 
 698 So.2d 189, 214 (Ala.Crim.App.1996), aff'd, 698 So.2d 219 (Ala.1997). Accordingly, the trial court properly denied Hiler’s motions for a judgment of acquittal as to the menacing charge.
 

 For the above-stated reasons, we affirm the trial court’s judgment as to the menacing conviction and reverse the trial court’s judgment and render judgment in favor of Hiler as to the falsely reporting an incident conviction.
 

 AFFIRMED AS TO CONVICTION FOR MENACING; REVERSED AND JUDGMENT RENDERED AS TO CONVICTION FOR FALSELY REPORTING AN INCIDENT.
 

 WINDOM and KELLUM, JJ., concur.
 

 WELCH, J., concurs in the result.
 

 [1]
 

 . Hiler was also indicted for making a terrorist threat and obstructing governmental operations, but the jury acquitted him of those charges.
 

 [2]
 

 .
 
 Because of our disposition of this argument, we need not address Hiler's argument that "there was no evidence the public at large was inconvenienced” and that "[t]he purported false report did not result in the evacuation of a 'public building.’ " (Hiler’s brief at pp. 17-18.)