*689 On Application for Rehearing
On Return to Remand *
JOINER, Judge.
This Court’s opinion issued on August 12, 2016, is withdrawn, and the following is substituted therefor.
Jordan Andrew Thomas was convicted of murder, see § 13A-6-2, Ala. Code 1976, and was sentenced to 75 years’ imprisonment. The trial court ordered Thomas to pay a $5,000 crime-victims-compensation assessment, $8,489.14 in restitution, and court costs.
Facts and Procedural History
The evidence at trial tended to establish the following: On the evening of October 9, 2012, Dennis Johnson, Keniethia Wilson, Cory Morris, DeAndre Hale, Parrish Anderson, and Frederick Pierce were at Pierce’s residence on Doris Circle in Montgomery. While Johnson sat on the front porch, a Nissan Altima automobile pulled up behind a vehicle parked in the front yard. Wilson asked Johnson who was in the Altima, and Johnson replied that it was Jordan Thomas. Wilson asked Johnson if he was all right because she knew that Johnson and Thomas had “had prior altercations,” and Johnson replied that he was fine. (R. 63.) Wilson went inside the house and, shortly thereafter, she heard gunshots and turned around to see Thomas shooting a black handgun. Wilson testified:
“Everybody in the house started getting down. So after the shot, I could see [Thomas]. He was backing up. He backed up to the car....

((

“And that’s when DeAndre [Hale] was fixing to run out the door to return fire. But [Thomas] shot again at the door. DeAndre backed up. And once [Thomas] got in the car, DeAndre went back out the door and returned fire. [Thomas] had—he rolled the window down, shooting out the window.
“By that time, I looked over and seen [Johnson] was laying down. He just kept hollering, ‘I’m hit. I’m hit. I’m hit.’ So I ran over there trying to get him up, but he was too heavy. So Parrish [Anderson] and Frederick [Pierce] came to help me get him up.”
(R. 64-65.) Wilson and Anderson placed Johnson in a car and drove him to a hospital, where he later died. Wilson testified that Johnson had a firearm on him that evening but that “it didn’t come out of his pocket until [they] were picking him up off the ground.” (R. 65.) Wilson testified that she never saw Johnson fire the gun or have it in his hand that evening.
Pierce testified that he went outside after the shooting stopped and that he washed blood off his porch and picked up spent shell casings. Pierce threw the shell casings in a trash can and later notified law enforcement of their location. Pierce also picked up a .38 caliber Rossi brand revolver from his yard and took it into the house. Pierce testified that, to his knowledge, the gun had not been fired. On cross-examination, Pierce testified that he had seen Johnson with the .38 caliber revolver earlier in the day. Pierce also testified that there was no “bad blood” between him and Thomas and that he had never told Thomas to stay away from his residence.
Cory McQueen testified that he, Thomas, and Shawn Williams were together on the evening of October 9, 2012. McQueen testified that he was friends with the individuals who were at Pierce’s house that night. Thomas told McQueen that an individual named Byrd, who owed Thomas money, telephoned Thomas to tell him that he was at Pierce’s house. Thomas asked McQueen to drive him there, and McQueen *690 complied. When McQueen pulled up to the house, Thomas and Williams got out of the car. McQueen suddenly heard .gunshots, and Williams returned to the ■ car. McQueen asked Williams where Thomas was, and Williams replied that Thomas was “one of the ones up there shooting.” (R. 86.). Thomas returned to the car and said to McQueen, “Your homeboy trying to kill me.” (R. 86.) McQueen observed Johnson “run to the side of the house” and drop an unidentified object on the ground.[1] McQueen then saw Hale come out of the house with an assault rifle and begin shooting toward their car. McQueen drove away, and Thomas continued to shoot toward the house while leaning out of the window of the automobile. McQueen testified that, up until that point, he had not seen Thomas with a gun. Eventually, McQueen and Williams got out of the vehicle because they were angry with Thomas for his involvement in the shooting. McQueen testified that the individuals who went to the hospital with Johnson telephoned McQueen later that evening and informed him that Johnson had been “sitting on the porch with the gun in his lap.” (R. 93.)
Detective Andrew Magnus of the Montgomery Police Department responded to the crime scene after Johnson had been taken to the hospital. Detective Magnus viewed the shell casings Pierce had placed in the trash can and determined that they came from two different weapons. Detective Magnus testified that he collected the revolver that had been in Johnson’s possession and.sent it to the Alabama Department of Forensic Sciences (“ADFS”).
After Detective Magnus left Pierce’s house, he responded to the criminal-investigation division to interview witnesses. Detective Magnus interviewed the individuals who were present at Pierce’s residence at the time of the incident, including McQueen and Williams. Detective Magnus testified that all witnesses’ accounts of the incident coincided. Detective Magnus testified that Thomas, accompanied by counsel, arrived at the police station the following day to provide a statement. Thomases video-recorded statement was played for the jury. When giving his statement, Thomas informed Detective Magnus that he went to Pierce’s house to get $10 from Byrd. Thomas stated that there were several vehicles in Pierce’s driveway and that, after he walked past one car, he saw a man at the house holding an AK-47 assault rifle. Thomas stated that he was nervous but that he tried to “play , it cool.” (State’s Exhibit 61.) Thomas stated that there was a chair on Pierce’s porch- but Johnson was not sitting in it.
Thomas stated that he said “What’s up?” to Johnson and that Johnson replied, ‘You know what’s up!” in an aggressive manner. (State’s Exhibit 61.) Thomas stated that Johnson then “upped” an AK-47 at him. Thomas stated that he then looked at the screen door and saw an individual holding a shotgun open the screen door and aim the shotgun toward him. Thomas stated that he then heard two shots and saw that someone was shooting toward his car. Thomas stated that three or four people were shooting at that point and that he started, shooting ■ toward Johnson while running back to his car. Thomas stated that he shot Johnson only twice. Thomas denied that he shot his firearm first and that he followed Johnson, continually shooting him. Thomas informed Detective Magnus that he tossed his firearm from his car as he was driving on Interstate 85. Detective Magnus testified that law-en *691 forcement officers searched for the firearm but were unable to locate it.
Thomas explained to Detective Magnus that McQueen and Williams called the police after the shooting because they were afraid of the people who had been at Pierce’s house. Thomas stated that the people were affiliated with the Blood gang and described them as “monsters” that “you don’t want to see on the street.” (State’s Exhibit ,61.) Thomas confirmed that, when he was 14'years old, he and Johnson had an altercation because Johnson had stolen a gun from him. Following the viewing of Thomas’s statement, Detective Magnus testified that Thomas informed him that “he was real cool with everyone in the house.” (R. 200.)
Dr. Stephen Boudreau, a medical examiner for the State of Alabama, performed an autopsy on Johnson and testified that Johnson died as a result of multiple gunshot wounds.
The following discussion • occurred at a charge conference:
“THE COURT: ...
“The Court will allow the case to go to the jury on murder. The Court will allow it to go to the jury on manslaughter.
“However, this is not a stand-your-ground case. Don’t even try to • argue that. It doesn’t come up under the facts of the statute on stand-your-ground.
‘You know, I will—you know, you’re saying self-defense came out of the statement. Well, I will allow it to go to the jury on manslaughter but not stand-your-ground. Okay? .
“[DEFENSE COUNSEL]: On self-defense at all? Nothing?
“THE COURT: Yeah. Well, yeah, on self-defense.
“[DEFENSE COUNSEL]: Okay.
“THE COURT: And what the first part of that statute states, but not the stand-your-ground portion. All right.
[[Image here]]
“[DEFENSE COUNSEL]: I just want to raise an objection for the record that the evidence and testimony is consistent with a self-defense 'stand-your-ground case and instruction. We have provided the Court with an instruction, ¿nd a brief accompanies that. And, again, juát to protect the record.
“THE COURT: Motion denied.”
(R. 219-20.)
During its oral' jury charge, the trial court instructed the jury with respect to self-defense:
“I ... charge you, the defendant has raised the question of self-defense and, since he has raised the question, I’m obligated to charge you on what the law says about that. •
“Section 13A-3-23[, Ala. Code 1975,] reads as follows: A person is justified in using physical force against another person in order to defend himself from what he or she—what he reasonably believes to be the use or imminent use of unlawful physical force by that other person and he may use a degree of force which he reasonably’believes to be necessary for the purpose.
“A person may use deadly physical force and is legally presumed to be justified in using deadly physical force in self-defense if the person reasonably believes that another person has used or [is] about to use unlawful deadly force against him. That is the law on self-defense.”
(R. 260-61.)
Thomas was ultimately convicted of murder.' Thomas filed a motion for a new trial, asserting, among other issues, that the trial court erred when it denied his request for a stand-your-ground jury instruction. The record does not indicate that the trial court ruled on his motion for *692 a new trial; therefore, it was denied by operation of law.
On February 3, 2016, this Court remanded this case to the trial court for that court “to hold an evidentiary hearing on [Thomas’s motion for a new trial] and then enter an order either granting or denying the motion.” (Record on Return to Remand, 12.) The trial court complied with our order and held an evidentiary hearing on April 6, 2016. Following the hearing, the trial court issued a written order denying Thomas’s motion, stating:
“This court has heard testimony and received exhibits and the court records and finds that the trial judge, Judge Charles Price, was correct in his denial of this requested charge. The facts of this case are clear that [Thomas] was not acting in a lawful manner and the requested jury charge was improper.”
(Record on Return to Remand, 40-41.)
Discussion
On appeal, Thomas raises several issues. Because we reverse Thomas’s conviction because of the trial court’s failure to give a stand-your-ground jury instruction, we do not address Thomas’s remaining claims.
“ ‘A trial court has broad discretion in formulating its jury instructions, provided they are an accurate reflection of the law and facts of the case.’ United States v. Padilla-Martinez, 762 F.2d 942 (11th Cir. 1985). However, a ‘defendant is entitled to have the court instruct the jury on his defense theory, “assuming that the theory has foundation in the evidence and legal support.” United States v. Conroy, 589 F.2d 1258, 1273 (5th Cir. 1979).’ United States v. Terebecki, 692 F.2d 1345, 1351 (11th Cir. 1982). ‘In order to determine whether the evidence is sufficient to necessitate an instruction and allow the jury to consider the defense, “we must accept the testimony most favorably to the defendant.” (Citations omitted.) United States v. Lewis, 592 F.2d 1282, 1286 (5th Cir. 1979).’ Coon v. State, 494 So.2d 184, 186 (Ala. Crim. App. 1986).”
George v. State, 159 So.3d 90, 93 (Ala. Crim. App. 2014).
Section 13A-3-23, Ala. Code 1975, provides, in relevant part:
“(a) A person is justified in using physical force upon another person in order to defend himself or herself or a thud person from what he or she reasonably believes to be the use or imminent use of unlawful' physical force by that other person, and he or she may use a degree of force which he or she reasonably believes to be necessary for the purpose. A person may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person pursuant to subdivision (5), if the person reasonably believes that another person is:
“(1) Using or about to use unlawful deadly physical force.
[[Image here]]
“(b) A person who is justified under subsection (a) in using physical force, including deadly physical force, and who is not engaged in an unlawful activity and is in any place where he or she has the right to be has no duty to retreat and has the right to stand his or her ground.”
The State in its brief on application for rehearing argues that “there was no theory under the facts of this case to support any instruction regarding whether Thomas had any duty to retreat.” (State’s brief on application for rehearing, p.6.) Specifically, the State argues that “because the critical issue in this case was the identity of the initial aggressor, whether Thomas had any duty. to retreat was never an issue.” *693 (State’s brief on application for rehearing, p. 12.)
Initially, we note that the State did not present this argument in its original brief on appeal. Rather than argue that the duty to retreat was “never an issue,” the State argued that Thomas did not meet the requirements for an instruction that he did not have a duty to retreat. Because the State raises this issue for the first time on rehearing, we question whether it is properly before this Court. See Water Works & Sewer Bd. of City of Selma v. Randolph, 833 So.2d 604, 608-09 (Ala. 2002)(“The well-settled rule of this Court precludes consideration of arguments made for the first time on rehearing. See Ex parte Lovejoy, 790 So.2d 933, 938-99 (Ala. 2000), where this Court stated: ... “ ‘New supporting arguments presented for the first time on rehearing generally will not be eonsidéred.” Stover v. Alabama Farm Bureau Ins. Co., 467 So.2d 251, 253 (Ala. 1985)(on application for rehearing).” ’).
Regardless, the State’s argument is without merit.
As this Court has previously stated, “an accused who claims to have been justified in using deadly force under § 13A-3-23 must have complied with the common-law rules regarding the duty to retreat unless he or she meets the requirements of § 13A-3-23(b).” Malone v. State, 221 So.3d 1153, 1156 (Ala. Crim. App. 2016). Therefore, the question whether Thomas had a duty to retreat was implicitly at issue in this case.
The State itself presented evidence indicating that Thomas was not prohibited from being at Pierce’s residence on the evening of October 9, 2012. Pierce testified that Thomas was not forbidden from being at his residence, and Detective Magnus testified that Thomas informed him that he “was real cool with everyone in the house.” (R. 200.) McQueen testified that Thomas went to Pierce’s residence that evening at the invitation of an individual named Byrd with the intention of collecting money Byrd owed him. Moreover, the State did not present evidence indicating that Thomas was engaged in any unlawful activity while at Pierce’s residence.
Accepting the testimony most favorably to Thomas, we hold that it was error for the trial court to refuse to instruct the jury on a stand-your-ground theory of self-defense. Such a determination belongs to the jury and is not for this Court to decide. See Smith v. State, 698 So.2d 189, 214 (Ala. Crim. App. 1996), aff'd, 698 So.2d 219 (Ala. 1997) (emphasis added) (noting that it is well settled that “[t]he weight and probative value to be given to the evidence, the credibility of the witnesses, the resolution of conflicting testimony, and inferences to be drawn from the evidence are for the jury”). The jury charge was incomplete in that it did not inform the jury that Thomas had no duty to retreat unless he was acting in a way that was unlawful or was at a place where he did not have the right to be. See George v. State, 159 So.3d 90, 95 (Ala. Crim. App. 2014) (“[T]he no-duty-to-retreat provision applies if the person claiming its protection was ‘not engaged in unlawful activity and ‘[was] in any place were he or she ha[d] a right to be.’ ”); see also Williams v. State, 46 So.3d 970, 972 (Ala. Crim. App. 2010) (holding that “the trial court erred when it refused to reinstruct the jury regarding the right to stand one’s ground pursuant to the current version of § 13A-3-23(b), Ala. Code 1975”). Thomas was entitled to a jury charge containing a complete statement of the law, and it was within the province of the jury to accept or reject Thomas’s stand-your-ground self-defense theory.
*694 Conclusion
The trial court should have instructed the jury on stand-your-ground self-defense in accordance with § 13A-3-23(b), Ala. Code 1975. Accordingly, we reverse the trial court’s judgment and remand this case for proceedings consistent with this opinion.
APPLICATION FOR REHEARING OVERRULED; OPINION OF AUGUST 12, 2016, WITHDRAWN; OPINION SUB STITUTED; REVERSED AND RE MANDED.
Windom, P.J., and Welch and Burke, JJ., concur. Kellum, J., not sitting.

 Note from the reporter of decisions: On February 3, 2016, this case was remanded by order.

. On cross-examination, McQueen testified •that he witnessed Johnson drop a gun. On redirect examination, McQueen testified that he saw Johnson drop something but that he did not "know whether.it was a gun or not.” (R. 92.)